Kellie Lerner
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas, Suite 2601
New York, NY 10019
Telephone: (212) 980-7400
klerner@robinskaplan.com

Kimberly A. Justice (*pro hac vice*)
**FREED KANNER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6487
kjustice@fklmlaw.com

*Interim Co-Lead Counsel for End-User Plaintiffs*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: FRAGRANCE END-USER PLAINTIFF ANTITRUST LITIGATION** | CIVIL ACTION NO:  23-16127 (WJM)(JSA)<br><br>**END-USER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................................1

II.   JURISDICTION AND VENUE ...............................................................6

III.  PARTIES ..................................................................................................8

      A.    Plaintiffs ........................................................................................8

      B.    Defendants....................................................................................20

      C.    Agents and Co-Conspirators .......................................................26

IV.   FACTUAL ALLEGATIONS ..................................................................27

      A.    The Fragrance Industry ...............................................................27

            1.    The Production of Fragrances...........................................29

            2.    Defendants' Fragrance Products Are Interchangeable
                  with Each Other ................................................................37

            3.    Defendants Supply Each Other with Fragrance
                  Ingredients........................................................................40

      B.    The Structure and Characteristics of the Fragrances Products
            Market Support the Existence of a Conspiracy...........................40

            1.    The Market Is Highly Concentrated and the Defendants
                  Are the Dominant Firms ...................................................41

            2.    Defendants are Vertically Integrated .................................46

            3.    Barriers to Entry Are High.................................................48

            4.    The Buy-Side of Market Is Not Highly Concentrated.............51

            5.    Demand for Fragrances Is Inelastic ....................................52

            6.    Fragrance Products Are Commodities...................................53

**TABLE OF CONTENTS**
(continued)

**Page**

7.    Fragrances are Nondurable Products ......................................53

8.    Industry Associations Provided Defendants Forums to Collude and Assisted Defendants in Carrying out Their Conspiracy ..........................................................................53

C.   Defendants Coordinated Parallel Price Increases During the Class Period .......................................................................62

D.   Defendants Monitored Their Conspiracy ..........................................75

E.   Defendants' Pretextual Reasons for Their Prices Increases ...............77

F.   Defendants' Coordinated Price Increases Substantially Improved Their Profitability .............................................................81

G.   Defendants Restrained and Allocated the Supply of Key Fragrance Ingredients ........................................................................85

H.   Government Authorities Conduct Dawn Raids On Defendants ........90

V.    PLAINTIFFS' CLAIMS ARE TIMELY ......................................................98

A.   Continuing Violation ..........................................................................98

B.   Fraudulent Concealment .....................................................................99

VI.   CLASS ACTION ALLEGATIONS ...........................................................101

VII.  CLAIMS FOR RELIEF .............................................................................106

VIII. PRAYER FOR RELIEF ............................................................................177

IX.   DEMAND FOR JURY TRIAL .................................................................179

-ii-

Plaintiffs, on behalf of themselves and all others similarly situated (the "Classes" "or "Class Members" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief based on investigation of counsel as to all other matters, bring suit against Defendants DSM-Firmenich AG, Firmenich International SA, Firmenich Inc., Agilex Flavors & Fragrance, Inc. (collectively, Firmenich"); Givaudan SA, Givaudan Fragrances Corporation, Ungerer & Company, Inc., and Custom Essence LLC (collectively, "Givaudan"); Symrise AG, Symrise Inc., and Symrise US LLC (collectively, "Symrise"); and International Flavors & Fragrances, Inc. ("IFF") (collectively, "Defendants"). Plaintiff and the Classes seek injunctive relief, treble damages, costs, attorneys' fees, and other just relief for Defendants' *per se* violations of Section 1 of the Sherman Act, 15 U.S.C § 1, state antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment laws of the several States. Plaintiffs demand a trial by jury.

## I.   NATURE OF THE ACTION

1.   Plaintiffs bring this civil antitrust action seeking treble damages arising out of Defendants' conspiracy to fix, raise, maintain, and stabilize the prices for fragrance ingredients and fragrance compounds (collectively, "Fragrance Products" (further defined below)), and allocate and unreasonably restrain trade in the market for Fragrance Products, sold in the United States from, at least as early

as, January 1, 2018, until such time as the anticompetitive effects of the conduct cease ("Class Period").

2.     Companies add Fragrances Products (scent) to consumer products and household goods to make those products smell pleasant. Consumer products are sometimes called final goods because they end up in the hands of the consumer or end-user. Consumer products that contain Fragrance Products include, but are not limited to, fine fragrances, personal care, skin care, and hair care products. Likewise household goods that contain Fragrances Products include, but are not limited to, cleaners, detergents, and fabric care products. A product's smell helps establish a positive olfactory (and emotional) association with the product. Fragrance Products are therefore a key input in consumer products and household goods.

3.     Defendants named in this Complaint are the four largest global manufacturers of Fragrance Products, controlling nearly two-thirds of the global and U.S. markets. Defendants acquire raw materials and convert them into Fragrance Products, before selling them on to companies, for production into fine fragrances and consumer and household goods.  Defendants' sale of Fragrance Products is a multi-billion business in the United States.

4.     Beginning at least as early as January 1, 2018, Defendants entered into an unlawful agreement to increase the prices of Fragrance Products.  Upon

information and belief, Defendants' conspiracy to fix prices for Fragrance Products

began in response to publicized increases in the costs of certain raw materials –

vanilla and citrus -- needed to manufacture some Fragrance Products. To protect

their profits, Defendant conspired to restrain the supply, coordinate the prices, and

allocate the market for Fragrance Products.

5.      Defendants coordinated to implement incremental, contemporaneous

price increases during the Class Period, all while experiencing growth in their

Fragrance sale volumes and profitability. In a competitive market, rising prices

would have caused a decrease in demand; and yet, Defendants continued to

increase their profitability (despite additional hurdles caused by the COVID-19

pandemic, supply chain disruptions, and rapid inflation).

6.      Plaintiffs learned of Defendants conspiracy no earlier than March 7,

2023.  On that date, the European Commission ("EC") announced that it had

carried out dawn raids at several suppliers and an industry association in the

Fragrance Products industry in coordination with the Swiss Competition

Commission ("COMCO"), the U.S. Department of Justice Antitrust Division

("DOJ"), and the U.K. Competition and Markets Authority ("CMA").[1]

---

[1]      European Commission Press Release IP/23/1532, Antitrust: Commission
Confirms Unannounced Inspections in the Fragrance Sector (Mar. 7, 2023),
https://ec.europa.eu/
commission/presscorner/detail/en/ip_23_1532.

7.     The same day, CMA provided further insight into the dawn raids, announcing that it "has reason to suspect anti-competitive behaviour has taken place involving suppliers of fragrances and fragrance ingredients for use in the manufacture of consumer products such as household and personal care products," and named Firmenich International SA, Givaudan SA, International Flavors & Fragrances Inc., and Symrise AG as the subjects of the investigation.[2]

8.     The next day, COMCO revealed that the dawn raids were based on "indications that several undertakings active in the production of fragrances have violated cartel law."[3]  COMCO identified the same Defendants as targets of the dawn raids and disclosed that "[t]here are suspicions that these undertakings have coordinated their pricing policy, prohibited their competitors from supplying certain customers and limited the production of certain fragrances."[4]

9.     In a May 10, 2023 filing with the U.S. Securities and Exchange Commission, IFF acknowledged the investigation and disclosed that it had

---

[2]     *CMA Launches Investigation into Fragrances and Fragrances Ingredients*, CMA COMPETITION & MARKETS AUTHORITY (last updated Mar. 8, 2023), https://www.gov.uk/ government/news/cma-launches-investigation-into-fragrances-and-fragrance-ingredients.

[3]     The Swiss Competition Commission Press Release, Frank Stüssi & Andrea Graber Cardinaux, COMCO Investigates Possible Collusions in the Fragrance Market (Mar. 8, 2023), https://www.weko.admin.ch/weko/en/home/medien/press-releases/nsb-news.msg-id-93502.html.

[4]     *Id.*

received a criminal grand jury subpoena from the DOJ,[5] meaning the DOJ is considering a criminal prosecution against IFF and/or its co-conspirators. According to Section F.1 of Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Similarly, Firmenich also disclosed that it received a subpoena from the Antitrust Division of the DOJ.[6]

   10.   On January 17, 2024, CMA revealed that it had extended its probe of Givaudan, Firmenich and IFF to include allegations that they engaged in further anticompetitive behavior in the form of so-called no-poach agreements. Specifically, CMA stated that the companies may have engaged in unlawful coordination involving reciprocal arrangements relating to the hiring or recruitment of certain staff involved in the supply of Fragrance Products.[7]

---

[5]   International Flavors & Fragrances Inc., Quarterly Report, Form 10-Q (May 10, 2023).

[6]   Firmenich, Financial Statements 2023 (June 30, 2023), at 48, https://www.dsm-firmenich.com/content/dam/dsm-firmenich/corporate/documents/firmenich-sa-annual-report-fy2023.pdf.

[7]   *Suspected anti-competitive conduct in relation to fragrances and fragrance ingredients (51257)*, CMA COMPETITION & MARKETS AUTHORITY (updated January 17, 2024), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-fragrances-and-fragrance-ingredients-51257.

11.    As a direct result of Defendants' conspiracy, Plaintiffs purchased products containing Fragrance Products from one or more Defendants at artificially inflated prices and were thereby injured in their business or property.  Plaintiffs bring this action on behalf of themselves and  Classes of end-user purchasers of consumer products and household goods containing Fragrance Products manufactured by the Defendants during the period from January 1, 2018 until the effects of the conspiracy have ceased (the "Class Period").

## II.    JURISDICTION AND VENUE

12.    Plaintiffs bring this action on behalf of the Nationwide Class (defined below) under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). This court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

13.    Plaintiffs also assert claims for actual and exemplary damages and injunctive relief pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violation of those state laws. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some

members of the proposed Classes are citizens of a state different from some defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

14.     This Court has personal jurisdiction over each of the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of New Jersey. Defendants Symrise Inc., Firmenich Inc., and Agilex Flavors & Fragrances, Inc. all reside in this District and used their headquarters in Teterboro, Plainsboro, and Piscataway, New Jersey, respectively, to implement and coordinate the restraints of trade described herein. In addition, Defendants: (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, Class Members located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District. For example:

- Each of the Defendants regularly sold products in the state of New Jersey during the Class Period and continue to sell products in the state of New Jersey;

- In addition to the companies mentioned above that are headquartered in New Jersey, Givaudan Fragrances Corp. runs its operations mainly out of New Jersey and IFF has its principal research and development operations partially in New Jersey;

- Both during the Class Period and through the present, all Defendants or their subsidiaries maintain substantial operations in this District; and

- Both during the Class Period and through the present, all Defendants transacted substantial business in this district, including making significant sales within the District.

15.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

16.     Defendants' Fragrances Products at issue in this case are sold in interstate commerce. Defendants' collusive conduct was intended to, and did, cause injury to Plaintiff and the Classes, who purchased products containing Fragrances Products manufactured and sold by Defendants, or any co-conspirator of Defendants. Defendants expressly aimed their conspiracy at the U.S. marketplace and their collusive conduct has resulted in an adverse effect on purchasers of products containing Fragrances Products in each state identified in this Complaint.

### III.   PARTIES

**A.    Plaintiffs**

17.     Plaintiff Maria Barron is a citizen of Arizona. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at

least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

18.     Plaintiff Jessica Howe is a citizen of Arizona. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

19.     Plaintiff Phyllis Jackson is a citizen of Arkansas. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

20.     Plaintiff Jennifer McGehee is a citizen of Arkansas. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

21.     Plaintiff Masees Skenderian is a citizen of California. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

22.     Plaintiff Alethea Andrews is a citizen of California. During the Class Period, she purchased products containing Fragrance Products manufactured or

sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

23.    Plaintiff Nicole Padilla is a citizen of California. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

24.    Plaintiff Charlette Atencio is a citizen of Colorado. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

25.    Plaintiff Dana Evans is a citizen of Colorado. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

26.    Plaintiff Matthew DeNapoles is a citizen of Connecticut. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

27.    Plaintiff Havva Murtishi is a citizen of Connecticut. During the Class Period, she purchased  products containing Fragrance Products manufactured or

sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

28.    Plaintiff Eleanor Pressler is a citizen of Washington, District of Columbia. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

29.    Plaintiff Carmen Pelliteri is a citizen of Florida. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

30.    Plaintiff Alana Manuia is a citizen of Hawaii. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

31.    Plaintiff Elli Ward is a citizen of Hawaii. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

32.    Plaintiff Suzen Isai is a citizen of Illinois. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least

one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

33.     Plaintiff Joseph Collins is a citizen of Illinois. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

34.     Plaintiff Samuel Johnson is a citizen of Illinois. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

35.     Plaintiff Shan Greer is a citizen of Iowa. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

36.     Plaintiff Nancy Koepke is a citizen of Iowa. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

37.     Plaintiff Brian Depperschmidt is a citizen of Kansas. During the Class Period, he purchased products containing Fragrance Products manufactured or sold

by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

38.    Plaintiff Isaac Landreth is a citizen of Maine. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

39.    Plaintiff Scott Carpenter is a citizen of Maine. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

40.    Plaintiff Cynthia Reese is a citizen of Massachusetts. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

41.    Plaintiff Douglas Borowski is a citizen of Massachusetts. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

42.    Plaintiff Mirlinda Elmazi is a citizen of Michigan. During the Class Period, she purchased products containing Fragrance Products manufactured or

sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

43.     Plaintiff Frank Novak is a citizen of Michigan. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

44.     Plaintiff Andrea Hogan is a citizen of Minnesota. During the Class Period, she purchased  products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

45.     Plaintiff Sandra Kluessendorf is a citizen of Minnesota. During the Class Period, she purchased  products in Minnesota and Wisconsin that contained Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

46.     Plaintiff Apostle Cynthia Bolden is a citizen of Mississippi. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

47.     Plaintiff Brandy Littrell is a citizen of Mississippi. During the Class Period, she purchased products containing Fragrance Products manufactured or

sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

48.     Plaintiff Tiffnie Kitchens is a citizen of Mississippi. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

49.     Plaintiff Tonia West is a citizen of Missouri. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

50.     Plaintiff Mary Peterson is a citizen of Montana. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

51.     Plaintiff Jasmine Judy is a citizen of Nebraska. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

52.     Plaintiff Terry Brown is a citizen of Nevada. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at

least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

53.    Plaintiff Kionna Love is a citizen of Nevada. During the Class Period, she purchased  products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

54.    Plaintiff Paula DiCianno is a citizen of Nevada. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

55.    Plaintiff Berniece Van Der Berg is a citizen of New Hampshire. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

56.    Plaintiff Arlinda Kongoli is a citizen of New Jersey. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

57.    Plaintiff Liridon Camaj is a citizen of New Jersey. During the Class Period, he purchased products containing Fragrance Products manufactured or sold

by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

58.     Plaintiff Monica Lord is a citizen of New Jersey. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

59.     Plaintiff Christine Schorr is a citizen of New Jersey. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

60.     Plaintiff Jodie Elmore is a citizen of New Mexico. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

61.     Plaintiff Milan Montano is a citizen of New Mexico. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

62.     Plaintiff Daniel Nabavian is a citizen of New York. During the Class Period, he purchased products containing Fragrance Products manufactured or sold

by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

63.     Plaintiff Letia Dickerson is a citizen of North Carolina. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

64.     Plaintiff Kimberly Webb is a citizen of North Carolina. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

65.     Plaintiff Sophia Dashab is a citizen of North Carolina. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

66.     Plaintiff Mandy Bryant is a citizen of Oregon. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

67.     Plaintiff Nicole Langlo is a citizen of Oregon. During the Class Period, she purchased  products containing Fragrance Products manufactured or

sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

68.     Plaintiff Alex Greenzweig is a citizen of Pennsylvania. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

69.     Plaintiff Charlotte Williams is a citizen of South Carolina. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

70.     Plaintiff Casey Christensen is a citizen of South Dakota. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

71.     Plaintiff Yvonne Peychal is a citizen of Tennessee. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

72.     Plaintiff Stephen Mack is a citizen of Utah. During the Class Period, he purchased products containing Fragrance Products manufactured or sold by at

least one Defendant, and he suffered injury as a result of the unlawful conduct alleged herein.

73.     Plaintiff Leslee Martin is a citizen of West Virginia. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

74.     Plaintiff Michele Matheny is a citizen of West Virginia. During the Class Period, she purchased products containing Fragrance Products manufactured or sold by at least one Defendant, and she suffered injury as a result of the unlawful conduct alleged herein.

**B.     Defendants**

75.     **IFF Defendant**.  Defendant International Flavors & Fragrances Inc. ("IFF") is a New York corporation that manufactures and sells flavors and fragrances.  IFF maintains its principal place of business at 521 West 57th Street, New York, New York 10019.  IFF is listed on the New York Stock Exchange under the ticker symbol IFF.  During the Class Period, IFF manufactured and/or sold Fragrance Products to purchasers in the United States directly or through predecessors, affiliates, or subsidiaries.

76.     **Givaudan Defendants**.  Defendant Givaudan SA is a Swiss corporation that manufactures and sells flavors and fragrances.  Givaudan SA is

headquartered at Chemin de la Parfumerie 5, 1214 Vernier, Switzerland.  Givaudan

SA is listed on the SIX Swiss Exchange under the ticker symbol GIVN.  Givaudan

SA has extensive operations throughout the United States, either directly or

through its wholly-owned and controlled subsidiaries and affiliates.  During the

Class Period, Givaudan SA manufactured and/or sold Fragrance Products to

purchasers in the United States and elsewhere, directly or through predecessors,

affiliates, or subsidiaries.

77.    Defendant Givaudan Fragrances Corporation is a U.S. subsidiary of

Givaudan SA incorporated under the laws of Delaware.  Givaudan Fragrances

Corporation maintains its principal place of business at 717 Ridgedale Avenue,

East Hanover, New Jersey 7936.  During the Class Period, Givaudan Fragrances

Corporation manufactured and/or sold Fragrance Products to purchasers in the

United States directly or through predecessors, affiliates, or subsidiaries.  Givaudan

SA controls Givaudan Fragrances Corporation both generally and with respect to

the conduct of Givaudan Fragrances Corporation in furtherance of the unlawful

acts alleged in this Complaint.

78.    Defendant Ungerer & Company, Inc. ("Ungerer") is a Delaware

corporation with its principal place of business located at 4 Ungerer Way, Lincoln,

Park, New Jersey 07035.  Ungerer and its related companies are U.S.-based

fragrance developers and suppliers that focus predominantly on natural ingredients

for fragrance and flavor creation, as well as for end customers of such specialties.[8]

Givaudan SA acquired Ungerer in 2020, and since then has operated it as wholly-owned subsidiary.[9] Since the acquisition, Givaudan SA has controlled Ungerer both generally and with respect to the conduct of Ungerer in furtherance of the unlawful acts alleged in this Complaint.

79.     Defendant Custom Essence LLC ("Custom Essence") is a New Jersey corporation with its principal place of business located at 53 Veronica Ave., Somerset, New Jersey 00873. Prior to late 2021, Custom Essence was registered and conducted business as Custom Essence Incorporated. Custom Essence specializes in the formulation of natural fragrance and creates perfumes for customers. Givaudan SA acquired Custom Essence in 2021, and since then has operated it as a wholly-owned subsidiary. Since the acquisition, Givaudan SA has controlled Custom Essence both generally and with respect to the conduct of Custom Essence in furtherance of the unlawful acts alleged in this Complaint. Givaudan SA, Givaudan Fragrances Corporation, Ungerer, and Custom Essence are collectively referred to as "Givaudan."

---

[8]      *Givaudan completes acquisition of Ungerer*, GIVAUDAN (Feb. 20, 2020), https://www.givaudan.com/media/media-releases/2020/givaudan-completes-acquisition-ungerer.

[9]      *Id.*

80.   **Firmenich Defendants**.  Defendant DSM-Firmenich AG is a Swiss corporation that manufactures and sells flavors and fragrances. DSM-Firmenich AG is headquartered at Wurmisweg 576 Kaiseraugst, AG 4303 Switzerland and is listed on the Euronext Amsterdam stock exchange under the ticker symbol DSFIR. DSM-Firmenich AG was created by the merger of DSM Group and Firmenich International SA, which was completed on May 8, 2023. DSM-Firmenich AG has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, DSM-Firmenich AG manufactured and/or sold Fragrance Products to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, or subsidiaries.

81.   Defendant Firmenich International SA is a Swiss corporation that manufactures and sells flavors and fragrances. Firmenich is headquartered at Rue de la Bergère 7, 1242 Satigny, Switzerland. Prior to its merger with DSM Group on May 8, 2023, Firmenich International SA had extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates.  During the Class Period, Firmenich International SA manufactured and/or sold Fragrance Products to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, or subsidiaries.

82.     Defendant Firmenich Inc. is a U.S. subsidiary of DSM-Firmenich AG incorporated under the laws of Delaware. Firmenich Inc. maintains its principal place of business at 250 Plainsboro Road, Plainsboro, New Jersey 08536.  During the Class Period, Firmenich Inc. manufactured and/or sold Fragrance Products to purchasers in the United States, directly or through predecessors, affiliates, or subsidiaries. During the relevant period, Firmenich International SA and/or DSM-Firmenich AG have controlled Firmenich Inc. both generally and with respect to the conduct of Firmenich Inc. in furtherance of the unlawful acts alleged in this Complaint.

83.     Defendant Agilex Flavors & Fragrances, Inc. ("Agilex") is a U.S. subsidiary of DSM-Firmenich AG incorporated under the laws of Delaware. Agilex maintains its principal place of business at 140 Centennial Avenue, Piscataway, New Jersey 08854.  During the Class Period, Agilex manufactured and/or sold Fragrance Products to purchasers in the United States, directly or through predecessors, affiliates, or subsidiaries.  Firmenich International SA announced that it had completed the acquisition of Agilex on July 11, 2017.  On May 9, 2023, Agilex announced that its new parent entity would be DSM-Firmenich AG.  Since the acquisition, Firmenich International SA and/or DSM-Firmenich AG have controlled Agilex both generally and with respect to the conduct of Agilex in furtherance of the unlawful acts alleged in this Complaint.

DSM-Firmenich AG, Firmenich International SA, Firmenich Inc., and Agilex are collectively referred to as "Firmenich."

84.     **Symrise Defendants**.  Defendant Symrise AG is a German company that manufactures and sells flavors and fragrances.  It was created in 2003 by the merger of Bayer subsidiary Haarmann & Reimer and Dragoco, both of which were based in Holzminden, Germany.  Symrise AG maintains a principal place of business at Mühlenfeldstraße 1, 37603 Holzminden, Germany.  Symrise AG states that "Our Corporate Center is located in Holzminden, Germany.  Key corporate functions such as governance and control, communications and administration are located here."[10]  Symrise AG has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates.  During the Class Period, Symrise AG manufactured and/or sold Fragrance Products to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, or subsidiaries.

85.     Defendant Symrise Inc. is a U.S. subsidiary of Symrise AG incorporated under the laws of New Jersey.  Symrise Inc. maintains its principal place of business at 300 North Street, Teterboro, New Jersey 07608.  During the Class Period, Symrise Inc. manufactured and/or sold Fragrance Products to

---

[10]     Symrise, Global Locations Page, https://www.symrise.com/our-company/global-locations/ (last visited Jan. 9, 2024).

purchasers in the United States, directly or through predecessors, affiliates, or subsidiaries.  Symrise AG controls Symrise Inc. both generally and with respect to the conduct of Symrise Inc. in furtherance of the unlawful acts alleged in this Complaint.

86.    Defendant Symrise US LLC is a subsidiary of Symrise AG, and is headquartered in Teterboro New Jersey, with offices located at 300 North Street, Teterboro, New Jersey 07608.  Symrise US LLC is a limited liability company organized and existing under the laws of the State of Delaware.  Symrise US LLC transacts or has transacted business in this District, and is engaged in the development, manufacture, and sale of flavors and fragrances.  Symrise AG controls Symrise US LLC both generally and with respect to the conduct of Symrise US LLC in furtherance of the unlawful acts alleged in this Complaint. Symrise AG, Symrise Inc., and Symrise US LLC are collectively referred to as "Symrise."

87.    Each of the entities within a corporate family carried out the business of manufacturing, distributing, marketing, and/or selling Fragrance Products in coordination with their parents, subsidiaries, siblings, and related entities.

**C.    Agents and Co-Conspirators**

88.    The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or

representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

89.    Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Defendants are jointly and severally liable for the acts of the co-conspirators whether or not named as defendants in this Complaint.

90.    Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

91.    The term "Defendants" as used in this Complaint refers to and encompasses each Defendant and its successors, parent companies, subsidiaries, affiliates, employees, agents, officers, and directors.

## IV.    FACTUAL ALLEGATIONS

### A.    The Fragrance Industry

92.    A product's scent helps establish a positive and familiar olfactory response to the product. Smells are also linked to a product's functional use. For example, lemon or other citrus scents are often associated with cleanliness, and mint with freshness. Scents can also convey status; the smell of leather may signify luxury or richness. Research shows that most consumers "consider scent an

essential and necessary component of everyday household products."[11]  Indeed, the CEO of IFF's Scent division, Nicolas Mirzayantz, stated that "scent continues to be the #1 attribute driving purchase intent and even more importantly, the purchase repeat factor."[12] As such, the addition of these Fragrances to goods drives sales for these products—products purchased by Plaintiffs and other Class Members.

93.     Consumer goods get their scents from fragrances.  Broadly speaking, a fragrance is a chemical mixture that has a smell or odor.[13]  Fragrances are derived from ingredients (natural or synthetic) and/or compounds.  The role of a fragrance is to impart a pleasant odor to the finished product and deliver a pleasant experience to the end user.  Fragrances are also used to disguise disfavored smells in the product, such that even products labelled as "unscented" may contain fragrances to mask the unpleasant smell of other ingredients, without giving the product a distinct scent.

---

[11]     Rachel S. Herz, et al., "A three-factor benefits framework for understanding consumer preference for scented household products: psychological interactions and implications for future development," Cogn. Research 7, 28 (April 1, 2022), https://cognitiveresearchjournal.springeropen.com/articles/10.1186/s41235-022-00378-6.

[12]     International Flavor & Fragrances Inc. Scent Learning Lab, Edited Transcript of conference call or presentation from April 5, 2021.

[13]     IFRA, What is a Fragrance?, https://ifrafragrance.org/fragrance-and-you/what-is-a-fragrance (last visited Jan. 9, 2024).

94.     Manufacturers of consumer goods generally do not produce their own fragrances.  Instead, they purchase fragrance ingredients and fragrance compounds from fragrance manufacturers, principally Defendants, for incorporation into various consumer products. Defendants, in turn, source their raw materials further upstream.

### 1.     The Production of Fragrances

95.     The fragrance industry can be broken down into three segments. First, there are the upstream suppliers of the raw materials used in the production of fragrances. As described in greater detail below, these raw materials include both natural and synthetic materials. Next, there are the manufacturers of fragrances, including Defendants, who use the raw materials to create fragrance ingredients and, as described in greater detail below, blend those fragrance ingredients into fragrance compounds. Finally, the downstream part of the industry consists of the producers of various consumer products that incorporate the fragrance ingredients and compounds. As discussed in greater detail below, these products generally fall into four distinct categories – fine fragrances (perfumes and colognes), fabric care (laundry detergents, fabric softeners, and specialty laundry products); home care

(household cleaners, dishwashing detergents, and air fresheners); and body care (personal wash, hair care, and toiletries products).[14]

The following chart from a report by the industry trade association International Fragrance Association illustrates the three channels of the market: [15]



### a.   Upstream Suppliers

96.   Starting in the upstream part of the industry, companies produce the raw materials used for production of Fragrance Products. These raw materials derive from both natural and synthetic sources. Natural raw materials are extracted

---

[14]    International Flavors & Fragrances, Inc., 2021 Annual Report (Form 10-K), at 4 (Feb. 28, 2022).

[15]    The Value of Fragrance, A Socio-Economic Contribution Study for the Global Fragrance Industry, 11, IFRA (June 2019), https://ifrafragrance.org/docs/default-source/policy-documents/pwc-value-of-fragrance-report-2019.pdf?sfvrsn=b3d049c8_0#page=13.

from natural sources, such as plants, trees, or animals, by physical or

biotechnological procedures.

97.     Synthetic raw materials are created in a lab and manufactured on an

industrial scale. More than 95% of the chemicals in synthetic fragrances are

derived from petrochemicals, such as phthalates, synthetic musks, parabens, and

benzene derivatives.[16]

### b.     Fragrance Production

98.     Defendants source natural and synthetic raw materials for their

fragrance businesses. Within their business, Defendants make and sell both

"fragrance ingredients" and "fragrance compounds" (collectively, "Fragrance

Products"). Defendants thus occupy a critical point of the supply chain, producing

fragrances that are essential to many consumer products.

99.     A fragrance ingredient is any basic substance used for its odor

properties or malodor coverage as a component of a fragrance compound, which

can be natural or synthetic.  Per Defendant IFF's 2021 Annual Report, "[f]ragrance

ingredients are natural and synthetic, and active and functional ingredients that are

---

[16]     *Synthetic Fragrances*, UP FRONT COSMETICS (May 14, 2020),
https://upfrontcosmetics.ca/blogs/be-upfront/synthetic-fragrances.

used internally and sold to third parties, including competitors, for use in the preparation of compounds."[17]

100.    Using natural raw materials, fragrance manufacturers use various methods to extract the aromatics to create "natural" fragrance ingredients. The name for a specific natural fragrance ingredient stems from a combination of the raw material and the method of extraction.  Thus, the same raw material may result in an essential oil, absolute, concrete, pomade or tincture depending upon the extraction method.[18]  For example, the oil obtained by steam distillation of lavender is called essential oil of lavender or, simply, lavender oil.[19]

101.    Naturally-derived fragrance ingredients are temperamental.  Much like grapes used to make wine, weather and other environmental impacts may affect the strength or scent of the raw materials used in fragrance ingredients. Additionally, these raw materials may negatively interact with other ingredients in consumer products. Jasmine oil is known to cause discoloration in soaps.[20]

---

[17]    IFF, 2021 Annual Report, *supra* note 14 at 5.

[18]    Claire Guillemin, LAW & ODEUR: FRAGRANCE PROTECTION IN THE FIELDS OF PERFUMERY AND COSMETICS 43-44 (1st ed. 2016) (citation omitted).

[19]    Charles S. Sell, "Perfumery Materials of Natural Origin," The Chemistry of Fragrances: From Perfumer to Consumer 69 (2d ed. 2006).

[20]    *Id.* at 81.

102.   Defendants also make synthetic ingredients, which can either be nature-identical or artificial. Nature-identical synthetic fragrances are made with synthetically derived ingredients to have the same key chemicals that define a fragrance found in nature and will be judged to have a similar odor. Some synthetic ingredients slightly modify the structural features of the natural material to make them less susceptible to degradation or interaction with other ingredients. For instance, the synthesis of jasmine is easier and more amendable to commercial products if slight modifications are made to the molecular chemistry.[21] Artificial fragrances are made from synthetic ingredients and have a scent and/or chemical composition not known to be found in nature.

103.   Defendants sell fragrance ingredients to each other, to other fragrance compound makers, and to consumer product manufacturers.

104.   As set forth in Defendant IFF's 2021 Annual Report, fragrance compounds are "combinations of multiple fragrance ingredients that are ultimately used by our customers in their consumer goods."[22] Compounding a fragrance generally means making a formulation of more than one ingredient.

105.   Numerous organizations have developed classifications of fragrances. In 1990, the French Society of Perfumers published its "Classification des

---

[21]   *Id.* at 82.

[22]   IFF, 2021 Annual Report, *supra* note 14 at 4.

Parfums" which included the following families: citrus, floral, fougère, chypre, woody, amber and leather.[23]

106.  Likewise, Defendants categorized their fragrances in substantially similar manner. For example, Defendant Givaudan's website categorizes fragrances as follows:[24]



107.  The other Defendants use substantially similar descriptions to describe the Fragrance Products offered to customers, including terms, such as, amber, citrus, floral, fresh, green musk, spicy, and woody.[25]

---

[23]    Mans Boelens et al., "Classification of Perfumes and Fragrances," 26 Perfumer  &  Flavorist  28,  32  (Nov./Dec.  2001), https://img.perfumerflavorist.com/files/base/allured/all/document/2016/ 02/pf.PF_26_06_028_10.pdf.

[24]    Shaping Tomorrow's Signature Fragrances with Science, Givaudan, https://www.givaudan.com/fragrance-beauty/ingredients/fragrance-molecules.

[25]    *See* International Flavors & Fragrance, Fragrance Ingredients Online Compendium, https://www.iff.com/portfolio/products/fragrance-ingredients/online-compendium (last accessed Feb. 5, 2024); Givaudan, Interactive fragrance index,

108.   The production of Fragrance Products occurs at different facilities around the world, including in the United States. Within the United States, New Jersey is a primary production site for the fragrance industry. Givaudan manufactures fragrances in Mount Olive, New Jersey; IFF in Hazlet; Firmenich in Princeton; and Symrise in Teterboro. Fragrance Products manufactured in New Jersey are sold throughout the United States. Defendants also import Fragrance Products manufactured from their foreign operations into the United States for sale to customers.

109.   Fragrances are a multi-billion-dollar global industry.  Annual sales of fragrance ingredients were approximately $9.1 billion in 2022.[26]  Annual sales of fragrance compounds were valued at $35.08 billion in 2021.[27]  In the United States,

---

https://www.givaudan.com/fragrance-beauty/ingredients/fragrance-molecules (last accessed Feb. 5, 2024); Firmenich, Ingredients Perfumery Catalogue, Main Olfactive Family, https://www.firmenich.com/ingredients/ingredient-perfumery-catalog (last accessed Feb 5, 2024); and Symrise, Scent and Care, Aroma Molecules, Ingredient Finder, https://www.symrise.com/scent-and-care/aroma-molecules/ingredient-finder/ (last accessed Feb. 5, 2024).

[26]   Ltd, R. and M., Fragrance Ingredients Market: Global Industry Trends, Share, Size, Growth, Opportunity and Forecast 2023-2028, RESEARCH AND MARKETS (Jan. 2023), https://www.researchandmarkets.com/reports/5732797/fragrance-ingredients-market-global-industry.

[27]   Research and Markets, *Global Fragrance Market Report to 2027 - Accelerating E-Commerce Channels and Increasing Demand for Hygiene Products are Driving Growth,* GLOBENEWSWIRE NEWS ROOM (Nov. 10, 2022), https://www.globenewswire.com/en/news-release/2022/11/10/2552774/28124/en/Global-Fragrance-Market-Report-to-2027-

revenues in the fragrance market are estimated to reach \$8.71 billion in 2023.[28]

Defendants collectively sell billions of dollars' worth of fragrance ingredients

and/or compounds in the United States each year.[29]

### c.   Downstream Customers

110.   Defendants sell Fragrance Products for use in consumer products.

Fragrances are most often shipped as oils, but on some occasions are shipped as

powders. As IFF notes, the industry separates the use of Fragrance Products into

several end-use categories, including fine fragrances (perfumes and colognes);

fabric care (laundry detergents, fabric softeners, and specialty laundry products);

home care (household cleaners, dishwashing detergents, and air fresheners); and

body care (personal wash, hair care, and toiletries products).[30] The following chart

provides an illustrative example:[31]

---

Accelerating-E-Commerce-Channels-and-Increasing-Demand-for-Hygiene-Products-are-Driving-Growth.html.

[28]   Stylumia, 2023 Beauty Trends: the Allure of Scents, MEDIUM (Jan. 13, 2023), https://medium.com/@Stylumia/2023-beauty-trends-the-allure-of-scents-87ba629c145d.

[29]   IFF, 2021 Annual Report, *supra* note 14 at 4; IAL Consultants, An Overview of the Global Flavours & Fragrances Market, 13th Edition (Sept. 2022).

[30]   IFF, 2021 Annual Report, *supra* note 14 at 4.

[31]   An Overview of the Global Flavours & Fragrances Market, *supra* note 29.



111.   How a product smells – or its fragrance in industry parlance – is a key driver of consumer preference both at the point of purchase and throughout its use. As a result of the critical importance of fragrances to customer purchases – *i.e.*, the ability of a product's smell to drive sales for that product – fragrances are indispensable to consumer goods manufacturers.

### 2.   Defendants' Fragrance Products Are Interchangeable with Each Other

112.   Fragrance ingredients are interchangeable commodity chemicals extracted from natural plants or created in a lab via synthesis processes. Because fragrance ingredients are uniform chemicals, there is no meaningful difference between a fragrance ingredient (or combination of fragrance ingredients in the form of a fragrance compound) produced by one Defendant as compared to another.

113.   Symrise noted as much in its 2022 Corporate Report, stating, "Most of the fragrance ingredients we sell to our customers in our formulations are commodity products. The components are no secret. Anyone could use them and purchase the compounds on the market or even produce them themself [sic]."[32]

114.   Fragrance compounds produced by Defendants are also interchangeable. Beginning in the late 20th century, Defendants gained the ability to reverse engineer each other's fragrances using technologies, such as gas chromatography and mass spectrometry. The ability to reverse engineer a competitor's product means that a competitor can copy a proprietary blend and compete on price. Defendants' technical ability to reverse engineer one another's products has only increased with time. Larger companies, *e.g.*, the Defendants, have more capability to reverse engineer their competitor's products.

115.   Firmenich stated in a published study that mass chromatography and mass spectrometry "has threatened, if not eliminated, proprietary secrets" in the fragrance and flavor industry.[33] This means fragrance manufacturers, like the

---

[32]   Corporate Report 2022, Symrise AG, at 79 (March 8, 2023), available at https://symrise.com/corporatereport/2022/downloads/SYM_corporatereport_2022_EN.pdf.

[33]   Vincent Keller and Randy Burgess, ADEXA, Firmenich, Case Study, The flavor and fragrance of success (Oct. 2021), available at https://www.adexa.com/wp-content/uploads/2021/10/Case-Study_-Firmenich_Final.pdf (last accessed Feb. 5, 2024).

Defendants, could easily replicate each other's scents, which incentivized them to collude to undercut price competition and maintain artificially high prices.

116.   In fact, Defendants do manufacture and sell competing products. That is, Defendants sell similar fragrance profiles even if they market them as something unique or different. Thus, Fragrance Products based on the same active ingredients are largely interchangeable.

117.   IFF's 2021 annual report noted the substitutability of its products as a potential risk to its business. Specifically, IFF noted that "increasing [its Fragrance] prices to our customers could result in long-term sales declines or loss of market share if our customers find alternative suppliers or choose to reformulate their consumer products to rely less on our products, which could have an adverse long-term impact on our results of operations."[34]

118.   Similarly, Givaudan has admitted:

> there is a very high degree of supply-side substitutability for fragrances and that this market, therefore, should not be further segmented in a narrower way such as distinguishing between different applications (consumer products such as soaps/detergents, cosmetics, toiletries and other applications such as fine fragrances).  It explains that any fragrance producer can and does produce any fragrance irrespective of its end-use and can switch production relatively easily from one fragrance to another once the production equipment has been cleaned."[35]

---

[34]   IFF, 2021 Annual Report, *supra* note 14 at 14.

[35]   European Commission, Givaudan/Quest International Merger Case No. COMP/M. 4507, at 3-4 (Feb. 21, 2007).

119.   The substitutability of Defendants' Fragrance Products should have led to price competition among Defendants and substantially restrained their abilities to increase prices unilaterally.

### 3.   Defendants Supply Each Other with Fragrance Ingredients

120.   Defendants primarily manufacture fragrance ingredients to support their own fragrance compound business.

121.   Defendants also buy and sell excess fragrances ingredients from one another.[36]  By transacting with one another, Defendants learn of capacity and price points for fragrance ingredients from one another. The inter-Defendant sales increased their dependency on each other and provided a mechanism to enforce and monitor their conspiracy.

### B.   The Structure and Characteristics of the Fragrances Products Market Support the Existence of a Conspiracy

122.   The structure and other characteristics of the markets for Fragrance Products make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

---

[36]     Claire Guillemin, LAW & ODEUR: FRAGRANCE PROTECTION IN THE FIELDS OF PERFUMERY AND COSMETICS 92, 423, 427 (1st ed. 2016) (citation omitted); Symrise, Financial Report 2018 (Mar. 13, 2019), at 10, https://www.symrise.com/investors/financial-results/index.php/?eID=tx_securedownloads&p=1&u=0&g=0&t=1707004438&hash=2a99e982b89ed108946de6e550a8a3bf0464df7a&file=fileadmin/symrise/Downloads_reports/reports/documents/2019/190313_SYM_Financial_Report_2018.pdf.

1.    **The Market Is Highly Concentrated and the Defendants Are the Dominant Firms**

123.   A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

124.   The Defendants are the "four largest providers" in the market, and "together have a market share of 64%" in the global fragrance market.[37] Defendants' U.S. market shares are understood to be similar.



125.   Defendants have further cemented their control of the fragrance market through the acquisition of rivals, which has resulted in significant industry

---

[37]     Symrise AG, Financial Report 2022 at 12-13 (Mar. 8, 2023), https://www.symrise.com/newsroom/downloads/index.php/?eID=tx_securedownloads&p=458&u=0&g=0&t=1707084408&hash=7cce282b6ebec8da38dd3fb258e46c54e915aeaf&file=fileadmin/symrise/Downloads_reports/reports/documents/2023/230308-Symrise-Financial-Report-2022.pdf.

consolidation. As one industry analyst has noted, the Defendants' total share of the

market:

> is higher than previous years due to acquisitions and mergers. The
> opportunity to supply packages of products to their customers has
> become ever more attractive for the flavour and fragrance houses,
> reflected in various sideways and backwards integration moves in
> recent years. This is exemplified by the merger of IFF and DuPont's
> Nutrition & Biosciences (N&B) business and the pending merger
> between Firmenich and DSM.[38]

126.    Since at least 2016, Defendants have "focused on so-called bolt-on

acquisitions" to rapidly consolidate the market,[39] leading the industry to be

"dominated by just a few companies."[40] IFF in its 2022 Annual Report noted that

"there has been increased consolidation among our competitors."[41]

127.    Recent examples of fragrance-industry consolidation include:

| Year | Acquisitions |
|------|--------------|
|      |              |

---

[38]    An Overview of the Global Flavours & Fragrances Market, *supra* note 29.

[39]    Gillian Tan, *International Flavors & Fragrance: When Bland Is Good*, BLOOMBERG (May 10, 2016), https://www.bloomberg.com/opinion/articles/2016-05-10/international-flavors-fragrances-when-bland-is-good.

[40]    Andy Hoffman et al., *DSM Forms Flavor Giant with $21 Billion Deal for Firmenich*, BLOOMBERG (May 31, 2022), https://www.bloomberg.com/news/articles/2022-05-31/royal-dsm-agrees-to-merge-with-swiss-fragrance-maker-firmenich.

[41]    International Flavors & Fragrances, Annual Report 2022 (Form 10-K),  at 18 (Feb. 27, 2023).

| 2014 | IFF acquired Aromor Flavors and Fragrances Ltd.[42]<br><br>Symrise acquired Diana Group in a transaction valued at €1.3 billion.[43] |
|------|-----|
| 2015 | IFF acquired Ottens Flavors.[44] |
| 2016 | IFF acquired David Michael & Company, Inc.[45] |
| 2017 | Firmenich acquired Agilex Fragrances.[46] |
| 2018 | Firmenich acquired Flavourome.[47]<br><br>Firmenich acquired Natural Flavors.[48] |

---

[42]   Press Release, IFF Acquires Aromor to Strengthen Its Fragrance Ingredients and Fragrance Creation Capabilities (Jan. 16, 2014), https://ir.iff.com/news-releases/news-release-details/iff-acquires-aromor-strengthen-its-fragrance-ingredients-and.

[43]   *Symrise AG Successfully Closes Acquisition of Diana Group*, Symrise (July 29, 2014), https://www.symrise.com/newsroom/article/symrise-ag-successfully-closes-acquisition-of-diana-group/.

[44]   Press Release, IFF Completes Acquisition of Ottens Flavors (May 1, 2015), https://ir.iff.com/news-releases/news-release-details/iff-completes-acquisition-ottens-flavors.

[45]   Press Release, IFF Completes Acquisition of David Michael (Oct. 7, 2016), https://ir.iff.com/news-releases/news-release-details/iff-completes-acquisition-david-michael.

[46]   Press Release, Firmenich Completes Acquisition of Agilex Fragrances (July 11, 2017), https://www.firmenich.com/fragrance/press-release/firmenich-completes-acquisition-agilex-fragrances.

[47]   Press Release, Firmenich Completes Acquisition of "Flavourome", to Expand Presence in Africa (Feb. 5, 2018), https://www.firmenich.com/taste-and-beyond/press-release/firmenich-completes-acquisition-flavourome-expand-presence-africa.

[48]   Press Release, Firmenich Completes Acquisition of "Natural Flavors", Leader in Organic-Certified Flavors (Feb. 6, 2018),

| | |
|---|---|
| | Givaudan[49] acquired Expressions Parfumées.[50] |
| | Agilex (Firmenich) acquired Fragrance West.[51] |
| | Givaudan acquired Naturex.[52] |
| | IFF acquired Frutarom.[53] |
| | Firmenich acquired Senomyx.[54] |
| **2019** | Givaudan acquired Golden Frog.[55] |

---

https://www.firmenich.com/taste-and-beyond/press-release/firmenich-completes-acquisition-natural-flavors-leader-organic.

[49]     Givaudan, Investor Presentation (Feb. 2023), https://www.givaudan.com/files/giv-2023-investor-presentation-feb.pdf.

[50]     Givaudan Completes the Acquisition of Expressions Parfumées (May 29, 2018), https://www.givaudan.com/media/media-releases/2018/givaudan-completes-acquisition-expressions-parfumees.

[51]     Press Release, Agilex Fragrances Acquires Fragrance West to Expand Presence on United States West Coast (June 25, 2018), https://www.firmenich.com/fragrance/press-release/agilex-fragrances-acquires-fragrance-west-expand-presence-united-states.

[52]     Givaudan Completes the Acquisition and Delisting of Naturex (Sept. 18, 2018), https://www.givaudan.com/media/media-releases/2018/givaudan-completes-acquisition-and-delisting-naturex.

[53]     Press Release, IFF Completes Combination with Frutarom, Establishing a Global Leader in Taste, Scent and Nutrition (Oct. 4, 2018), https://ir.iff.com/news-releases/news-release-details/iff-completes-combination-frutarom-establishing-global-leader.

[54]     Press Release, Firmenich Successfully Completes Tender Offer to Acquire Senomyx (Nov. 2, 2018), https://www.firmenich.com/taste-and-beyond/press-release/firmenich-successfully-completes-tender-offer-acquire-senomyx.

[55]     Givaudan Completes Acquisition of Vietnamese Flavour Company Golden Frog (Sept. 2, 2019), https://www.givaudan.com/media/media-releases/2019/acquisition-golden-frog-completed.

| | |
|---|---|
| | Givaudan announced agreement to acquire AMSilk GmbH's cosmetics unit.[56] |
| | Givaudan acquired Albert Vieille.[57] |
| | Givaudan acquired Fragrance Oils.[58] |
| | Givaudan acquired Drom.[59] |
| **2020** | Symrise entered into agreement to purchase Sensient Technologies Corporations' fragrances and aroma chemicals business unit.[60] |
| **2021** | IFF merged with DuPont's Nutrition & Biosciences business.[61] |

---

[56]    Givaudan to Acquire Cosmetics Business of AMSilk (Apr. 29, 2019), https://www. givaudan.com/media/media-releases/2019/givaudan-acquire-cosmetics-business-amsilk.

[57]    Givaudan Completes the Acquisition of Albert Vieille (May 6, 2019), https://www.givaudan.com/media/media-releases/2019/givaudan-completes-acquisition-albert-vieille.

[58]    Givaudan Acquires Fragrance Oils (Aug. 20, 2019), https://www.givaudan.com/media/ media-releases/2019/givaudan-acquires-fragrance-oils.

[59]    Givaudan Completes the Acquisition of Drom (Sept. 6, 2019), https://www.givaudan.com/ media/media-releases/2019/givaudan-completes-acquisition-drom.

[60]    *Symrise to Expand Scent & Care Activities Through Acquisition of Sensient's Fragrances Business Unit*, SYMRISE (Nov. 23, 2020), https://www.symrise.com/newsroom/article/symrise-to-expand-scent-care-activities-through-acquisition-of-sensients-fragrances-business-unit/.

[61]    Press Release, IFF to Complete Merger with DuPont's Nutrition & Biosciences Business (Feb. 1, 2021), https://ir.iff.com/news-releases/news-release-details/iff-complete-merger-duponts-nutrition-biosciences-business.

| | |
|---|---|
| | Givaudan acquired Custom Essence.[62] |

128.   In May 2023, DSM and Firmenich completed a merger[63] that gives its new entity — DSM-Firmenich AG valued at roughly $21 billion — "comparable footing to IFF," after IFF's combination with DuPont.[64]

129.   In sum, in recent years, Defendants acquired several rivals with operations focused on the United States, making the fragrance market in the United States exceptionally concentrated.

## 2.   Defendants are Vertically Integrated

130.   Defendants are vertically integrated to varying degrees. This means that Defendants control several stages of fragrance production, including the sourcing of raw materials, manufacturing, and distribution. Defendants describe their vertical integration as a strategic advantage. For example, in connection with an acquisition, Givaudan boasted that additional vertical integration would

---

[62]     Givaudan Completes the Acquisition of Custom Essence (Dec. 3, 2021), https://www.givaudan.com/media/media-releases/2021/givaudan-completes-acquisition-custom-essence.

[63]     Press Release, Firmenich Completes Merger of Equals With DSM (May 9, 2023), https://www.firmenich.com/company/press-release/firmenich-completes-merger-equals-dsm.

[64]     Samantha Oller, *DSM, Firmenich to Merge into 'Powerhouse of Innovation and Creativity'*, FOODDRIVE (June 2, 2022), https://www.fooddive.com/news/dsm-firmenich-to-merge-into-powerhouse-of-innovation-and-creativity/624759/.

"enhance our industry leadership."[65] IFF boasted that its vertical integration in bioscience "will be a key driver of our innovation platform,"[66] and Firmenich described its "unmatched, vertically integrated portfolio" as a "unique value proposition."[67] Robust vertical integration, like Defendants' operations, creates and reflects significant market power by alleviating sourcing issues, driving greater efficiencies, reducing costs, and allowing for more control along the manufacturing or distribution process. As a result, vertical integration reinforces barriers to entry into the fragrance market because prospective or smaller competitors cannot compete with the efficiencies and scale of Defendants.

---

[65]     Nicolas Mirzayantz, Remarks at International Flavor & Fragrance Inc. Presents at Barclays Global Consumer Staples Conference (Sept. 09, 2021), transcript available at https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Barclays-Global-Consumer-Staples-Co-37765129/.

[66]     Zonebourse (2021) Transcript: *International Flavor & Fragrance Inc. Presents at Barclays Global Consumer Staples Conference* (Virtual), https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Barclays-Global-Consumer-Staples-Co-37765129/.

[67]     Press Release, Firmenich Appoints New Leadership for Integrated Perfumery & Ingredients Organization (Feb. 8, 2023), https://www.firmenich.com/fragrance/press-release/firmenich-appoints-new-leadership-integrated-perfumery-ingredients.

### 3. Barriers to Entry Are High

131. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. The market for Fragrance Products has high barriers to entry.

132. Factors that deter new entry to the fragrance market include, but are not limited to:

**Regulations**. Fragrance suppliers are subject to legal and regulatory frameworks (*e.g.*, environmental, health, and safety) that are geographically specific. Large suppliers with an international presence and more robust resources have an advantage in navigating such regulations because they will have already invested in a compliance infrastructure as well as in lobbyists to influence the legal and regulatory framework.

**Scale**. Defendants benefit from economies of scale, which occur when increased output leads to lower average costs. Hopeful new entrants to the fragrance market find it difficult to compete because their average costs would be much higher than the larger incumbents, and because they lack similar promotion recourse. The mature and relatively saturated nature of the market also acts as a deterrent to new entrants.

**Access to Raw Materials**. Raw materials are sourced from all over the globe with attendant supply chain complexity. Access to materials used as inputs is of critical importance to the ability of a firm to enter the market. Defendants, as the largest suppliers, maintain substantial control over access to key ingredients because they produce those ingredients themselves.

**Core Supplier Lists**. Large multinational customers – who are Defendants' key clients in terms of purchasing volume – purchase from a short list of core suppliers. Core fragrance suppliers are formally

selected to work as a preferred partner on a given product line for a duration from three to four years, effectively freezing out smaller, untested new suppliers.  On April 15, 2021, Mr. Mirzayantz described the qualification process to be selected to be on a core supplier list as analogous to competing for the "Olympics."[68]

**High Capital Requirements**.  Only a few fragrance companies have the skills, capacity, and resources to manufacture fragrance ingredients and fragrance compounds.  The amount of research and development, marketing, and capital expenditure required to enter this industry and gain market share has limited the number of industry operators.  To gain market share, companies spend large sums of money on marketing and to acquire competitors.  New entrants must overcome the need for substantial financing.

133.    Defendants IFF and Givaudan have repeatedly touted to their investors that the Fragrance market is protected by high barriers to entry. Givaudan listed the industry's "high barrier to entry (complexity, R&D, consumer insight, regulations, etc.)" as a key investment highlight in a 2022 investor presentation.[69]  Givaudan's Chief Financial Officer, Alison Cornell, boasted during the Deutsche Bank Global Consumer Conference on June 14, 2016, "the barriers to entry favor the large players, as they include an increasing global [indiscernible] regulatory environment; the need for capital investment in manufacturing facilities,

---

[68]    MarketScreener (2021) Transcript: *International Flavors & Fragrances Inc. - Special Call: Marketscreener, MarketScreener.com | stock exchange quotes| Company News*.  International Flavors & Fragrances Inc. Scent Learning Lab., https://www.marketscreener.com/ quote/stock/INTERNATIONAL-FLAVORS-F-13047/news/Transcript-International-Flavors-Fragrances-Inc-Special-Call-37787511/.

[69]    2022 General Investor Relations Presentation, GIVAUDAN (Jan. 2022), at 32, https://www.givaudan.com/files/giv-2022-investor-presentation_jan.pdf.

the significant and ongoing investment in research and development, the

complexity of managing global customers, and ongoing investment in ingredients,

people, intellectual property, and processes."[70]  Symrise gave a similar presentation

to its investors in 2019, stating high barriers to entry included "core list system and

increasing regulatory pressure."[71]

134.    Givaudan reiterated these points again in a February 2023 investor

presentation, stating that the company is protected by "**High barriers to entry** and

high shifting costs for customers."[72]  Givaudan directly linked high barriers to

entry with market share, stating in a February 2020 investor presentation that

---

[70]    Transcript : International Flavors &Fragrances Inc. Presents at
DeutscheBank Global Consumer Conference, Zonebourse (June 14, 2016),
https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-
13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-
Deutsche-Bank-Global-Consumer-Confe-38010620/.
INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-
Flavors-Fragrances-Inc-Presents-at-Deutsche-Bank-Global-Consumer-Confe-
38010620/.

[71]    Olaf Klinger (CFO), *Symrise Investor Presentation*, SYMRISE (June 2019), at
6,
https://www.symrise.com/fileadmin/symrise/Corporate/Investors/Financial_calend
ar_and_presentations/190611_Symrise_Investor_Presentation_Paris.pdf.

[72]    Givaudan, Investor Presentation, *supra* note 49.

Defendants enjoyed "[l]eading market share…supported by substantial barriers to entry that continue to **protect incumbents**."[73]

135.   In a 2018 article, merger and acquisition advisory firm Grace Matthews, reiterated that barriers to entry in fragrances and flavors are high, as "technical expertise is highly valued, and regulatory compliance can be a significant issue as many products made by the F&F industry come into contact with the human body."[74]  Marifaith Hackett, Director of Specialty Chemicals with IHS Markit, explained, "'the business is fairly opaque to outsiders – by design, no doubt – and any new entrant to the F&F industry would have to expect a fairly sharp learning curve'" and "'[n]ew entrants tend to start out small.'"[75]  The author of the article added, "[t]hese new entrants are often founded by individuals with pre-existing knowledge and contacts in the industry."[76]

### 4.   The Buy-Side of Market Is Not Highly Concentrated

136.   The fact that the buy-side of the fragrances market is not highly concentrated is consistent with collusion. With many buyers, most comprising a

---

[73]   Givaudan, Investor Presentation (Feb. 2020), https://www.givaudan.com/files/giv-2020-investor-presentation-jan-oct.pdf (emphasis added).

[74]   Vincent Valk, *High Valuations Do Not Stop Flavors and Fragrances Deals*, GRACE MATTHEWS (Dec. 6, 2018), at 2, https://gracematthews.com/wp-content/uploads/2021/11/Highvaluationsdonotstopflavorsandfragrancesdeals.pdf.

[75]   *Id.*

[76]   *Id.*

small share of the total marketplace, there is less incentive for cartel members to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

137.   IFF, for example, "had no customers that accounted for greater than 10% of consolidated net sales in 2022, 2021 and 2020."[77]  In 2021, IFF's "25 largest customers, a majority of which were multi-national consumer products companies, collectively accounted for 29% of [its] sales in the aggregate."[78]

### 5.   Demand for Fragrances Is Inelastic

138.   Economic theory recognizes that industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices.  There are two primary characteristics that demonstrate the inelasticity of demand for Fragrance Products: a lack of substitute goods and the product being just one portion of the overall cost of the overall good.

139.   **Lack of Substitute Goods**: Substitute goods can serve to restrain price increases and temper the effects of a price-fixing conspiracy.  Even though Fragrance Products with the same scent are fungible, Fragrance Products are the only products that can provide the scent in consumer products. There are no

---

[77]     IFF, 2022 Annual Report, *supra* note 41 at 91.

[78]     IFF, 2021 Annual Report, *supra* note 14 at 18.

suitable substitute goods for fragrances that would work to restrain price increases of Fragrance Products.

### 6.     Fragrance Products Are Commodities

140.   As detailed above, Defendants' Fragrance Products are commodities. Coordination is easier with a commodity product because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where observed differences in prices, other than those arising because of differences in product grade, for example, are more likely to reflect cheating on the conspiracy than some kind of custom arrangement.

### 7.     Fragrances are Nondurable Products

141.   Additionally, Fragrance Products are nondurable products with a limited shelf life, some with "best before" dates of only one year after manufacture. The market for a nondurable good is easier to cartelize than a durable good market due to lower temptation for cartel members to cheat on sales of nondurable goods and less opportunity to price discriminate based on customers' different demand elasticities.

### 8.     Industry Associations Provided Defendants Forums to Collude and Assisted Defendants in Carrying out Their Conspiracy

142.   The European Commission announced that one of the entities that was raided on March 7, 2023, was an unnamed industry association, which has assisted the Defendants in carrying out their conspiracy.  The EC stated that it "has

concerns that companies and an association in the fragrance industry worldwide may have violated EU antitrust rules that prohibit cartels and restrictive business practices."[79]

143.   Courts have found industries in which main competitors participate in trade associations and frequently communicate with each other are susceptible to collusion.  Defendants control the most important trade associations and self-regulating bodies in the market for Fragrance Products.  This makes Fragrance Products more susceptible to collusive behavior because the trade organizations provide forums for the Defendants to exchange sensitive information such as pricing and outputs.  Defendants use their control of industry associations to facilitate their conspiracy.

144.   To start, Defendants coordinated and conspired through their control of International Fragrance Association ("IFRA").  IFRA is an official self-regulatory representative body of the worldwide fragrance industry with the stated goal of representing "the collective interests of the industry and promote the safe

---

[79]   Foo Yun Chee & Oliver Hirt, *EU, UK, Swiss Probe Suspected Fragrance Cartel, Givaudan Confirms Cooperation*, REUTERS (last updated Mar. 7, 2023), https://www.reuters.com/world/ europe/eu-antitrust-regulators-raid-companies-association-fragrance-sector-2023-03-07/.

use and enjoyment of fragrances around the world."[80]  IFRA is currently limited to

seven regular members: the Defendants, Robertet Group, Takasago International

Corporation, and BASF.

145.   The Defendants control IFRA's board.  For example, Symrise's Chief

Sustainability Officer, Hans Holger Gliewe, has been the chair of IFRA since April

of 2020.  Prior to Mr. Gliewe, Michael Carlos, previously President of Givaudan's

Fragrance Division and currently a board member of Givaudan, served as chair of

IFRA from 2015 to 2020.  To this day, every Defendant maintains a representative

on IFRA's board.

146.   IFRA has served as a mechanism to coordinate and facilitate

Defendants' conspiracy.  Every year, IFRA hosts the Global Fragrance Summit,

which is a multi-day event at which Defendants meet and intermingle.[81]  IFRA also

holds other events throughout the year for its members (including Defendants).

Through such events, Defendants have ample opportunity to meet and coordinate.

Indeed, the 2022 IFRA Global Fragrance Summit held from November 8, 2022 to

November 10, 2022 in São Paulo, Brazil was attended by several representatives of

Defendants, including Greg Adamson, the Senior Vice President of Global

---

[80]    IFRA, Making the difference – in every sense,
https://ifrafragrance.org/about-ifra/introduction (last visited Jan. 30, 2024).

[81]    IFRA, Dialogue, https://ifrafragrance.org/priorities/dialogue (last visited
April 20, 2023).

-55-

Regulatory Affairs at Givaudan; Jeremy Compton, Givaudan's Head of Science and Technology; Matteo Magnani, Firmenich's Chief Consumer and Innovation Officer, Ilaria Resta, Firmenich's Global President of Perfumery; Joris Theewis, IFF's Global Regulatory Strategic Lead; Gregory Ladics, IFF's Head of Product Safety and Chemical Management; and Eder Ramos, Symrise's Global President of its Fragrance Division.[82]

147.   In addition to IFRA, Defendants also control several other trade associations that provide forums for their collusive communications.  After jointly deciding to leave the then-extant North American trade association, in March 2021, Defendants launched their own North American trade organization, Fragrance Science & Advisory Council ("FSAC").[83]  Reporting at the time explained that FSAC "unites the world's leading fragrance and flavor companies in an effort to drive science-based public policy in North America."  FSAC set out with the express goal of focusing on "business-to-business audiences" in order to "defend[]

---

[82]   Global Fragrance Summit (Sao Paulo, Brazil 2022), available at https://www.mayerbrown.com/-/media/files/perspectives-events/events/2022/11/ifragfs2022_program.pdf?rev=dabc93abfbc74ddd82da63e6a7db58d0 (last accessed Feb. 5, 2024).

[83]   Lauren Nardella, *World's Biggest Fragrance and Flavor Firms Join Forces to Champion Science in Public Policy*, HBW INSIGHT (Mar. 31, 2021), https://hbw.pharmaintelligence.informa.com/RS151176/Worlds-Biggest-Fragrance-And-Flavor-Firms-Join-Forces-To-Champion-Science-In-Public-Policy.

fragrance ingredients" against, among other things, criticism from "consumer[s]."[84] At the beginning, Defendants were the ***only*** members of FSAC.  To date, FSAC has added only one non-Defendant member – Bath and Body Works.

148.   FSAC provides Defendants a unique opportunity to collude.  In addition to standard board and committee meetings, FSAC holds annual meetings. The inaugural annual meeting was held on December 9, 2021, and was attended by all Defendants.  According to a press release, FSAC's board and several committees, which are occupied by representatives of Defendants, "met to review progress and map goals and priorities for 2022."[85]

149.   As mentioned above, prior to founding FSAC, Defendants belonged to the North America-focused Fragrance Creators Association ("FCA").[86]  The timing of Defendants' departure from FCA and the founding of FSAC is highly suspicious – Defendants all announced they were leaving FCA on the same date – May 27, 2020.  In recent years, in direct conflict with Defendants' interests, FCA had been increasingly prioritizing consumer-focused fragrance safety transparency issues.  Instead of cooperating with the FCA's evolving mission towards greater

---

[84]     *Id*.

[85]     Industry News, *The Fragrance Science & Advocacy Council Holds Inaugural Annual Meeting in December 2021*, FSAC (Feb. 7, 2022), https://fsac.org/communications/fragrance-science-advocacy-council-holds-inaugural-annual-meeting-december-2021.

[86]     Nardella, *supra* note 83.

safety and transparency measures, Defendants created their own organization –
FSAC – that they controlled to lobby for legislation that would benefit the
Defendants at the expense of others (*i.e.*, smaller competitors and potential new
entrants into the market, and their own customers).  However, after the
investigation into Defendants began, IFF left FSAC and rejoined FCA.  In the
announcement that IFF rejoined FCA, FCA made no mention of the fact that IFF
once left the trade association and provides no reason for its rejoining.  It is
reasonable to infer that IFF recognized that FSAC presented a unique opportunity
to collude with its main competitors with only one other participant.  It is also
reasonable to infer that IFF left FSAC in an effort to shield itself from antitrust
liability once it realized it was under scrutiny from antitrust authorities.

150.   Defendants also are all members of the Research Institute for
Fragrance Materials ("RIFM"). RIFM holds itself out as a leading resource for the
safe use of fragrance ingredients and serves as the industry regulator in conjunction
with IFRA. RIFM conducts and publishes safety assessments of all ingredients
used for their aroma-producing properties. RIFM's activities include conducting
toxicity tests and allergy and photo toxicity testing of raw materials. After testing,
RIFM submits the results of the screening of the materials to IFRA, which then
ensures fragrance manufacturers' compliance with all relevant legislation and the
standards of safety and conduct in the industry set by IFRA. As Defendants have

authority in both RIFM and IFRA, they can influence the testing process for fragrances as well as regulatory and safety standards for Fragrance Products.

151.   Defendants all serve on RIFM's Advisory Committee and are the most prominent members of RIFM's "Core Teams," which "advise and consult on strategic issues related to RIFM's goals." Thus, Defendants attend meetings of RIFM's Advisory Committee and Core Teams together, and they exert significant influence over RIFM's activities.

152.   While the FCA (the trade organization that Defendants left to form FSAC) has focused its efforts on greater transparency with customers, the Defendant-controlled FSAC has used its power to "closely track[] fragrance-relevant developments at the U.S. Food and Drug Administration and U.S. Environmental Protection Agency and could be 'front and center' in discussions regarding fragrance ingredients."[87]

153.   Defendants have used their combined market share and chokehold on the FSAC to suppress innovation and customer choice, and delay safety and transparency initiatives advocated for by competitors. Defendants will continue to wield trade organizations to maintain their dominant market share; as FSAC President and Chairman of the Board admitted, "it will be one of these four

---

[87]      Nardella, *supra* note 83.

[fragrance] houses that will own the majority of the science and safety assessment data."[88] Nearly exclusive access to and control over this data will make it nearly impossible for small competitors to challenge industry standards coming out of the FSAC.

154.   Defendants' control of the FSAC in tandem with their influential positions in IFRA and RIFM cement Defendants' ability to dictate safety, health, and industry standards in the market for Fragrance Products.

155.   Defendants also had significant opportunities to collude at other industry events, including those thrown by the American Society of Perfumers. For instance, at the American Society of Perfumers' golf event, pictures show executives from Firmenich, Givaudan, and IFF paired in groups together.  And pictures from the American Society of Perfumers' Symposium similarly show Firmenich and IFF executives posing with their arms around each other.  These examples illustrate the coziness of executives from different fragrance companies as well as the many opportunities those executives had to collude and share competitively sensitive information with one another.

156.   Defendants also participate in the reoccurring World Perfumery Congress. Givaudan, IFF, and Firmenich are Diamond Sponsors of the 2024

---

[88]     *Id.*

conference while Symrise is a Platinum Sponsor.[89]  The self-described "Sensory

Event for Fragrance Leaders" is a multiday conference where industry insiders

meet to listen to presentations and attend networking receptions. The presentations

for the 2024 event include "The Current State of Fragrance According to Industry

Insiders," and "Trend Forecasts & Innovations in Home Care Scents."[90]

157.    On information and belief, by controlling the trade associations in the

market for Fragrance Products, Defendants used the trade association meetings as

forums to exchange competitively sensitive pricing and volume information and

organize their cartel.  As detailed above, these exchanges of information are

confirmed by IFF's admission on February 10, 2022, that it knew how an "awful

lot of [its] competitors" were pricing their products.  The reciprocal sharing of

firm-specific competitively sensitive information that would normally remain

private is a "super plus factor" that leads to a strong inference of active collusion.[91]

158.    Through participation in IFRA, FSAC, FCA, RIFM, the American

Society of Perfumers, the World Perfumery Congress and various other industry

---

[89]    World Perfumery Congress, https://worldperfumerycongress.com/ (last
accessed Jan. 30, 2024).

[90]    2024 World Perfumery Congress, The Sensory Event for Fragrance leaders,
https://wpc2024.mapyourshow.com/8_0/explore/session-fulllist.cfm#/ (last
accessed Jan. 30, 2024).

[91]    William E. Kovacic, Robert C. Marshall, Leslie M. Marx & Halbert L.
White, Plus Factors and Agreement in Antitrust Law, 110 Mich. L. Rev. 393
(2011). Available at: https://repository.law.umich.edu/mlr/vol110/iss3/1.

associations, Defendants had over a dozen opportunities to regularly meet and collude throughout the year.

## C. Defendants Coordinated Parallel Price Increases During the Class Period

159.   Defendants acted in concert to fix, raise, maintain, and stabilize the price of Fragrance Products manufactured, sold, distributed, or imported into the United States. This unlawful agreement in restraint of trade began at least as early as January 1, 2018, and continues into the present. Defendants' conduct constitutes a horizontal price-fixing conspiracy and violates Section 1 of the Sherman Act.

160.   During the period prior to the alleged conspiracy, fragrance prices in the United States were in a steady decline. The beginning of the conspiracy marked a period of flat prices followed by a dramatic increase by over 37%.[92]

161.   Since at least 2018, Defendants have coordinated price increase to increase their profits. The justifications offered by the Defendants—that their price increases were due primarily to increased input costs, chiefly stemming from the pandemic—were pretextual and do not fully account for the significant increases in prices over the Class Period.

---

[92]   United States Bureau of Labor Statistics, Producer Price Index by Commodity: Chemicals and Allied Products: Synthetic Organic Chemicals for Use as Flavor and Perfume Materials, retrieved from FRED, https://fred.stlouisfed.org/series/WPU061403997, (Feb. 1, 2024).

162.    These price increases are not adequately explained by market factors. Moreover, Defendants publicly stated their intent to raise prices throughout the Class Period, providing one another assurances that they would not compete for business on price.

163.    In a competitive market, increasing prices should result in customer churn, loss of sales volume, and loss of profits. Contrary to these basic economic principles, Defendants have repeatedly touted their ability to raise prices for Fragrance Products during the Class Period without any negative impact on their fragrance businesses.  Such circumstances further confirm both that Defendants have engaged in price fixing and that they were successful in doing so.

164.    Publicly available information shows that Defendants reported increasing prices in parallel on several occasions throughout the Class Period.  For example, in January 2018, Givaudan announced that it was raising prices on all products by 6% effective in February 2018.

165.    In an April 9, 2018 report on its first-quarter sales, Givaudan reported that it "continues to implement price increases in collaboration with its customers to compensate for the increases in input costs."[93] Likewise, Symrise reported in its

---

[93]    Press Release, Givaudan, First Quarter Sales (Apr. 9, 2018), https://www.givaudan.com/media/media-releases/2018/2018-first-quarter-sales.

first-quarter 2018 earnings call that "we continue to implement price increases in close dialogue with our customers to compensate for higher raw material cost."[94]

166.  In an August 7, 2018 SEC report, IFF disclosed that its "[n]et sales during the second quarter of 2018 increased 9%," due in part to "price increases" during the period.[95]

167.  On August 14, 2018, Symrise reported price increases in its fragrance segment through a press release, announcing that "the company is in close dialogue with its customers to actively implement price increases."[96]

168.  Less than one month later, on September 6, 2018, IFF then-CEO Andreas Fibig also announced that their "teams are out there and *increasing prices as much as they can*."[97]

---

[94]  Olaf Klinger, CFO & Member of Executive Board for Symrise AG, Remarks at Q1 2018 Symrise AG Earnings Call – Final (May 8, 2018) (Transcript available in Westlaw).

[95]  International Flavors & Fragrances, Inc., Quarterly Report (Form 10-Q), at 26 (Aug. 7, 2018), https://www.sec.gov/Archives/edgar/data/51253/000005125318000017/iff10-q218.htm.

[96]  *Strong Organic Growth of 9.0% in the First Half of 2018*, SYMRISE (Aug. 14, 2018), https://www.symrise.com/newsroom/article/strong-organic-growth-of-90-in-the-first-half-of-2018/.

[97]  Andreas Fibig, IFF's then-CEO, Remarks at International Flavors &Fragrances Inc. Presents at Barclays Global Consumer Staples Conference (Sept. 6, 2018) (Transcript available at zonebourse) (emphasis added), https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-

169.   Shortly after, on October 8, 2018, Givaudan confirmed that "the company continues to implement price increases in collaboration with its customers to compensate for the increases in input costs."[98]

170.   A few months later, during a January 25, 2019 investor call, Givaudan announced that the company was "working on price increases" for fragrances and that Givaudan was very "confident to pass on, let's say, the lion's share of the price increase for the combined 5%, 6% for both divisions in 2019, and there will be a, let's say, a relatively small tail end in 2020."[99]

171.   Coming full circle, on February 19, 2019, IFF's VP of Global Communications and Investor Relations, Michael Deveau, announced that IFF was looking to achieve "about a 4% price increase related to the scent" business.[100]

172.   Defendants continued touting their price increases throughout 2019.

---

Barclays-Global-Consumer-Staples-Co-37949946/ Defendants at times refer to their Fragrance division as their scent business.

[98]   2018 Nine Month Sales, Givaudan (Oct. 8, 2018), https://www.givaudan.com/media/media-releases/2018/2018-nine-month-sales.

[99]   Givaudan's (GVDBF) CEO Gilles Andrier on Q4 2018 Results (Jan. 25, 2019), https://seekingalpha.com/article/4235672-givaudans-gvdbf-ceo-gilles-andrier-on-q4-2018-results-earnings-call-transcript.

[100]   International Flavor & Fragrances Inc. at Consumer Analyst Group of New York Conference Transcript, https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents- at-CAGNY-2019-Conference-Feb-19-2019-37937566/.

173.   On July 18, 2019, Givaudan's CEO, Gilles Andrier, , with respect to managing raw material cost increases, "we are fully compensated with price increase."[101]   In other words, Givaudan was able to recoup all costs in connection with increases in the costs of raw material through price increases.   On August 10, 2019, Symrise's CFO, Olaf Klinger, reported that Symrise was "successful in getting through those price increases"[102] in the fragrance segment and, during a September 2019 CEO conference, IFF's then CEO Andreas Fibig touted that IFF had "seen in the last couple of quarters a mid-single-digit growth on the scent business, which was probably driven by – half of its volume growth, half of its price growth," which demonstrates that IFF has been increasing prices since at least sometime in 2019 without repercussions.[103]

---

[101]   Givaudan SA (GVDBF) CEO Gilles Andrier on Q2 2019 Results - Earnings Call Transcript, https://seekingalpha.com/article/4275832-givaudan-sa-gvdbf-ceo-gilles-andrier-on-q2-2019-results-earnings-call-transcript.

[102]   Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on Q2 2019 Results - Earnings Call Transcript.  Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on Q2 2019 Results - Earnings Call Transcript, https://seekingalpha.com/article/4284389-symrise-ag-syief-ceo-heinz-jurgen-bertram-on-q2-2019-results-earnings-call-transcript.

[103]   September 25, 2019 International Flavors & Fragrances Inc. at Sanford C Bernstein Strategic Decisions CEO Conference Transcript, https://www.marketscreener.com/quote/stock/INTERNATIONAL-FLAVORS-F-13047/news/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Bernstein-16th-Annual-Strategic-Dec-37916407/.

174.    Touting Symrise's strong fourth quarter 2019 performance, CFO Olaf Klinger reported that "[i]n 2019, [Symrise's] profitability grew stronger than the top line, mainly due to under-proportional raw material price increases and good cost management."[104] In the same call, CEO Heinz-Jürgen Bertam explained that "[r]aw material prices change and change all the time. As we use 10,000 raw materials typically…most of this levels out…a lot of these effects level themselves out."[105]

175.    Defendants increased prices again in 2020.  At Givaudan's July 21, 2020 earnings call, Givaudan SA CEO Gilles Andrier was asked how much of the company's 1% gross profit margin improvement was due to raw material costs. Andrier responded that raw material costs "had no material effect on the gross profit margin to explain the 1% improvement."[106]  Rather, the "improvement has lot to do with the price increase[s] that we have made."[107]  Mr. Andrier reported

---

[104]    Symrise AG Q4 2019 Results: Earnings Call Transcript, Seeking Alpha (Mar. 10, 2020), https://seekingalpha.com/article/4331042-symrise-ag-syief-ceo-heinz-jurgen-bertram-on-q4-2019-results-earnings-call-transcript.

[105]    *Id.*

[106]    Givaudan SA (GVDBF) CEO Gilles Andrier on Q2 2020 Results - Earnings Call Transcript, Seeking Alpha (July 21, 2020), https://seekingalpha.com/article/4359705-givaudan-sa-gvdbf-ceo-gilles-andrier-on-q2-2020-results-earnings-call-transcript.

[107]    *Id.*

that despite COVID-related setbacks, "on a like-for-like basis, our fragrance

division grew 4.5% and our Flavours [*sic*] division grew 3.6%."[108]

176.    Less than a month later, on August 11, 2020, during its 2020 earnings

results call, Firmenich's CEO, Gilbert Ghostine, reported that "in consumer

fragrance, we grew our revenue by 6%."[109]  CFO, Eric Nicolas, attributed the

company's (overall) increase in profitability to "successful pricing, as well as the

favourable impact of raw material costs."[110]

177.    Similarly, in reporting its 2020 financial results on March 9, 2021, Mr.

Klinger, Symrise's CFO, boasted that "[i]n Scent & Care, 40% of the organic

growth and pricing and 60% was volume related."[111]

178.    And, consistent with 2019 and 2020, Defendants hiked prices again in

2021.  For example, on November 9, 2021, IFF's then-CEO Andreas Fibig reported

that the company's fragrance division has had a "strong year" in part because of a

"sales profitability expansion of 110 basis points" that had been "led by higher

---

[108]    *Id.*

[109]    2020 Firmenich Earnings Results Call Transcript (August 11, 2020).

[110]    *Id.*

[111]    Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on 2020 Financial Results
– Earnings Call Transcript, https://seekingalpha.com/article/4412605-symrise-ag-
syief-ceo-heinz-jurgen-bertram-on-2020-financial-results-earnings-call-transcript.

volume, favorable mix and higher productivity."[112]  Mr. Fibig then stated that "[o]ur team . . . did an exceptional job increasing prices to combat inflationary pressures, something that will continue to be critical as we move forward."[113]  On the same earnings call, CFO Glenn Richter confirmed that IFF implemented "broad-based pricing actions across all of our businesses."[114]

179.   During an earrings call, Firmenich's CEO Gilbert Ghostine announced that for the six months ended December 31, 2021, Firmenich's "revenue grew by 12%" and "we increased our adjusted EBITDA by 25%."[115]  Firmenich achieved this solid revenue and profitability growth by increasing prices.  As Mr. Ghostine stated, "we are taking all the action in order to make sure that we pass [the higher cost] to our customers."[116]

180.   Symrise also confirmed 2021 price increases during an earnings call held on March 1, 2022, in which Symrise's new CEO, Dr. Heinz-Jürgen Bertram,

---

[112]   Q3 2021 International Flavors & Fragrances Inc. Earning Call Transcript, https://www.fool.com/earnings/call-transcripts/2021/11/09/international-flavors-fragrances-inc-iff-q3-2021-e/.

[113]   *Id.*

[114]   *Id.*

[115]   Firmenich Half Year 2022 Results Presentation Transcript. https://img06.en25.com/Web/FirmenichCorporateCenter1/%7B0e7a45ec-10c3-4ec4-b4a9-4d85bdd25d97%7D_Firmenich_HY22_Presentation_Script.pdf?elqTrackId=7a99220d2dc9457dbc515805c644723b&elqaid=450&elqat=2.

[116]   *Id.*

reported that "price increase initiatives were taken early on in the second half of last year" in its fragrance business.[117]

181.   After several years of steady price increases, on March 17, 2022, IFF again announced price increases that affected its fragrance business.[118]

182.   Less than one month later, on April 12, 2022, Givaudan announced that it would keep raising prices in 2022, purportedly to offset higher input costs despite like-for-like sales rising 4.6% in the first quarter.[119]

183.   In a May 10, 2022 earnings call, IFF noted that it had raised prices by approximately 8% in the preceding quarter.[120]  When asked by an analyst whether the steep price increases were leading to push back from customers, Franklin Clyburn, IFF Chief Executive Officer stated:

---

[117]   Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on Q4 2021 Results - Earnings Call Transcript, Seeking Alpha (Mar. 4, 2022), https://seekingalpha.com/article/4492962-symrise-ag-syief-ceo-dr-heinz-jurgen-bertram-on-q4-2021-results-earnings-call-transcript.

[118]   Press Release, IFF Announces Global Price Increases Across All Divisions (Mar. 17, 2022), https://ir.iff.com/news-releases/news-release-details/iff-announces-global-price-increases-across-all-divisions.

[119]   Givaudan to Keep Raising Prices After Q1 Sales Grew 4.6%, REUTERS (Apr. 12, 2022), https://www.reuters.com/business/retail-consumer/givaudan-keep-raising-prices-after-q1-sales-grew-46-2022-04-12/.

[120]   International Flavors & Fragrances Inc. (IFF) Q-1 2022 Earnings Call Transcript (May 10, 2022), https://news.alphastreet.com/international-flavors-fragrances-inc-iff-q1-2022-earnings-call-transcript/.

> There are pushbacks.  I think some of the pushbacks are in some of the smaller customers, some of our emerging market customers where price is much more sensitive.  We are seeing pushback there.[121]

Glenn Robert Richter, Executive Vice President and Chief Financial Officer of IFF elaborated, stating that:

> I'd say, first of all, obviously, **we're not unique**.  Every industry is experiencing substantial increases in inflation and **all of our competitors are out there basically taking prices up as well**.[122]

184.   Givaudan announced accelerated price increases again on July 21, 2022, despite like-for-like sales rising 7.9% year on the year as of the second quarter.[123]

185.   Shortly thereafter, on August 2, 2022, Symrise announced general price increases (including, apparently for fragrances) and its CEO, Dr. Bertram, boasted that the company managed to pass on the bulk of the higher costs to customers in the first half of the year.[124]

---

[121]   *Id.*

[122]   *Id.* (emphasis added).

[123]   Silke Koltrowitz, *Givaudan to Accelerate Price Increases as Input Costs Hit Margins*, REUTERS (July 21, 2022), https://www.reuters.com/business/retail-consumer/givaudan-confirms-mid-term-targets-works-pass-higher-prices-2022-07-21/.

[124]   Jagoda Darlak & David Latona, *Symrise Hikes Forecast as Higher Prices, Demand Offset Soaring Costs*, REUTERS (Aug. 2, 2022), https://www.reuters.com/business/germanys-symrise-raises-sales-outlook-increased-demand-2022-08-02/.

186.   A few days later, during the earnings call on August 5, 2022, Firmenich's CEO, Gilbert Ghostine, likewise announced parallel price increases despite a 32% increase in its fine fragrance sector.[125] Firmenich's CFO Benoit Fouilland stated "If you look at the mix of our growth, you will see 11% growth that we delivered in financial year '22 . . . 30% of the growth was coming from price . . . As you move towards the second part of the year the contribution of price to the overall growth has been increased."[126] Ghostine publicly also signaled Firmenich's plan of launching additional price hikes in the coming fiscal year – "So far we have passed on the vast majority of the cost increase already this year," and would continue doing so next year.[127]  Firmenich confirmed those additional price hikes in a November 22, 2022 press release.[128]

_____

[125]      Jennifer Weil, "Firmenich Posts Record Full-year Top- and Bottom-line Growth", Yahoo News, https://www.yahoo.com/news/firmenich-posts-record-full-top-182010078.html (Aug. 5, 2022).

[126]      Firmenich Full Year 2022 Results Transcript https://img06.en25.com/Web/FirmenichCorporateCenter1/%7B8d3b75af-a4c7-4e3a-ad0f-07828f370537%7D_Firmenich_Full_Year_2022_Results_transcript.pdf?elqTrackId=1137cb7ba0a1478d8368bff3787e7e5c&elqaid=450&elqat=2.

[127]      *Id.*

[128]      Firmenich Delivered Double-Digit Revenue Growth in the First Quarter of Financial Year 2023, Firmenich (Nov. 22, 2022), https://www.bloomberg.com/press-releases/2022-11-22/firmenich-delive230red-double-digit-revenue-growth-in-the-first-quarter-of-financial-year-2023.

187.    And, on November 8, 2022, IFF's CFO Glenn Richter boasted to investors that the "Scent division once again delivered a strong performance . . . due to volume growth, our price increases and productivity gains."[129]

188.    Defendants have continued to flaunt their ability to raise prices on Fragrance Products.  On January 25, 2023, Tom Hallam, Givaudan's CFO, noted to its investors that "price increases" had "partially compensated" for higher fragrance input costs.[130]

189.    Similarly, on February 9, 2023, IFF's CFO Glenn Richter indicated that there were price increases in its Scent division.[131]  Further, despite volume issues in other parts of the business, IFF's new CEO, Frank Clyburn, noted that "in [IFF's] scent business, we feel as though our [sales] volumes are very comparable to peers and the competitors."[132]

---

[129]    International Flavors & Fragrances Inc. (IFF) Q3 2022 Earnings Call Transcript, Seeking Alpha (Nov. 8, 2022), https://seekingalpha.com/article/4554858-international-flavors-and-fragrances-inc-iff-q3-2022-earnings-call-transcript.

[130]    Givaudan SA (GVDBF) Q4 2022 Earning Call Transcript, Seeking Alpha (Jan. 25, 2023), https://seekingalpha.com/article/4572304-givaudan-sa-gvdbf-q4-2022-earnings-call-transcript.

[131]    International Flavors & Fragrances Inc. (IFF) Q4 2022 Earnings Call Transcript, Seeking Alpha (Feb. 9, 2023), https://seekingalpha.com/article/4576967-international-flavors-and-fragrances-inc-iff-q4-2022-earnings-call-transcript.

[132]    *Id.*

190.   A week later, on February 16, 2023, Firmenich announced that "we continued to achieve strong momentum, with robust Revenue growth across the [fragrance ingredients] portfolio, supported by strong pricing measures and sustained customer demand" and the company is planning to take "further pricing actions."[133]  On the same day, during the earnings call, Mr. Ghostine, Firmenich's CEO affirmed the company's ability to increase prices without hurting sales – "we are [] able to combine price increases with sustained demand."[134]

191.   A month later, Olaf Klinger, the CFO at Symrise reported on the exceptional 11.4% sales growth. "Unlike normal years when [we] target a sales split of one third pricing and two third volume, '22 was far from normal. We needed to pass through high costs to our customers and were …---we were to a large extent successful. We achieved around 75% pricing and around 25% volume

---

[133]   *Firmenich Delivers Strong Results in First Half of Fiscal Year 2023*, FIRMENICH (Feb. 16, 2023), https://www.firmenich.com/company/press-release/firmenich-delivers-strong-results-first-half-fiscal-year-2023.

[134]   Firmenich Half Year 2023 Earnings Call Transcript, https://img06.en25.com/Web/FirmenichCorporateCenter1/%7B6cd374b9-a455-4446-a591-fa12c5c02f69%7D_Firmenich-Half-Year-2023-Results-Transcript.pdf?elqTrackId=7d2e6da218764acc9dd16aa804ee992c&elqaid=450&elqat=2.

growth in organic."[135] Defendants' ability to reliably increase prices **and** volume at the same time provides strong circumstantial evidence of their conspiracy.

192.   As alleged above, Defendants signaled and implemented parallel price increases throughout the Class Period and were able to do so without losing sales volumes or hurting profitability.  Such price increases – with respect to magnitude and frequency – should not have been possible in a truly competitive commodities market because customers would have taken their business elsewhere in response to rising prices.  Yet, Defendants' conspiracy prevented customers from switching to cheaper alternatives, therefore enabling Defendants to achieve price increases consistently – without loss of sales or profitability – over several years during the Class Period amid difficult economic conditions attributable to the COVID-19 pandemic, supply chain disruptions, and inflation.

**D.   Defendants Monitored Their Conspiracy**

193.   Price fixing cartels commonly monitor the conduct of the co-conspirators.  As noted by a Former Deputy Assistant Attorney General, in the Antitrust Division, Gary R. Spratling, who was responsible for investigating and prosecuting international cartels, cartels "have shared a number of common

---

[135] Symrise CFO Olaf Kinger on Q4 2022 results Earnings Call Transcript, Seeking Alpha (Mar. 8, 2023), https://seekingalpha.com/article/4585801-symrise-ag-syief-q4-2022-earnings-call-transcript.

characteristics."[136]  On top of agreed-upon and volumes, exchanges of otherwise competitively sensitive information, and prices charged to customers, a common characteristic among cartels includes "sophisticated mechanisms to monitor and police the agreements."[137]

194.    Through inter-Defendant sales and public statements, Defendants monitored their conspiracy.  IFF's public statements during the Class Period strongly suggest knowledge of each other's competitively sensitive pricing and sales information, which is also consistent with the existence of Defendants' unlawful agreement to fix prices.  On the February 10, 2022 conference call with investors, Andreas Fibig, CEO of IFF, confirmed that IFF was tracking competitively sensitive information when he noted that "competitors" were also raising prices and that IFF's price increases were "neck to neck" with IFF's competitors "in the market."[138]  On the same call, Mr. Fibig also stated "we actually expect, and what we've seen from an awful lot of our competitors is

---

[136]    Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, U.S. Department of Justice, ABA's Criminal Justice Section Presentation "Are the Recent Titanic Fines in Antitrust Case Just the Tip of the Iceberg?" (Mar. 6, 1998).

[137]    *Id.*

[138]    International Flavors & Fragrances Inc. (IFF) CEO Andreas Fibig on Q4 2021 results - Earnings Call Transcript, Seeking Alpha (Feb. 10, 2022), https://seekingalpha.com/article/4486003-international-flavors-and-fragrances-inc-iff-ceo-andreas-fibig-on-q4-2021-results-earnings.

everybody is basically implementing *the same range of pricing* in the market."[139] Similarly, Givaudan in its 2022 Integrated Annual Report stated that "[m]onitoring of the competitive landscape" is "[h]ow we mitigate risks."[140]

## E.   Defendants' Pretextual Reasons for Their Prices Increases

195.   On information and belief, the justifications offered by the Defendants — that their price increases were due to increased input costs or increased demand — were pretextual and could not fully account for the significant increases in prices over the Class Period.

196.   Defendants' conspiracy appears to have begun in response to claimed increases in the cost of key fragrance inputs, such as petrochemicals, vanilla, and citrus. Once Defendants entered into an illegal agreement to fix prices in or around 2018, Defendants continued the cartelized pricing conduct throughout the Class Period despite, as shown before, an easing in the costs of various raw materials.

197.   Defendants continued to increase prices, referring to the cost of raw materials as justification. This shows that Defendants had the collective power to increase prices without fear that a competitor (*i.e.*, one of the co-conspirators) would undercut them – a condition that is unnatural in a competitive market. For

---

[139]    *Id.* (emphasis added).

[140]    2022 Integrated Annual Report, Givaudan, at 24 (January 25, 2023), available at https://www.givaudan.com/files/giv-2022-integrated-annual-report.pdf.

example, among other instances, IFF disclosed on the November 8, 2022 earnings call, that "while we are clearly seeing signs of raw material inflation easing, we will continue taking appropriate targeted actions to offset inflation to maintain profitability,"[141] suggesting continued price increases even after the prices of raw materials stabilized. Indeed, on a February 9, 2023 call regarding 2022 Q4 earnings, IFF's CFO Glenn Richter confirmed that IFF had implemented price increases (a "catch up in pricing") during the fourth quarter of 2022 in the Scent division.[142]

198.   Similarly, on January 28, 2022, during a 2021 third quarter earnings call, Givaudan's CFO Tom Hallam observed that "the raw mat[erial]s were basically flat over 2021. So there is no reasons or argument to increase prices during, during 2021."[143] One year later, on January 25, 2023, despite continuous easing in the prices of raw materials, Mr. Hallam revealed that as a result of (and

---

[141]   Q3 2022 International Flavors & Fragrances Inc. Earning Call Transcript, Seeking Alpha (Nov. 8, 2022), https://seekingalpha.com/article/4554858-international-flavors-and-fragrances-inc-iff-q3-2022-earnings-call-transcript.

[142]   Q4 2022 International Flavors & Fragrances Inc. Earning Call Transcript, Seeking Alpha (Feb. 9, 2023), https://seekingalpha.com/article/4576967-international-flavors-and-fragrances-inc-iff-q4-2022-earnings-call-transcript.

[143]   Givaudan Q3 2021 Results – Earning Call Transcript, https://seekingalpha.com/article/4482632-givaudans-gvdbf-ceo-gilles-andrier-on-q3-2021-results-earnings-call-transcript.

despite) "price increases," sales and profit measures increased, indicating that Givaudan continued to increase prices despite raw material inflation easing.[144]

199.    Likewise, demand factors do not justify Defendants' price increases. Regarding demand, U.S. macroeconomic indicators of demand show that hourly earnings, personal consumption, per capital real GDP, and unemployment all returned to the post-Great Recession trend after recovering from the economic shock of the COVID-19 pandemic as the following chart shows:

---

[144]    Givaudan    SA    (GVDBF)    Q4    2022    Earning    Call    Transcript, https://seekingalpha.com/ article/4572304-givaudan-sa-gvdbf-q4-2022-earnings-call-transcript.



200. None of these developments point to demand as a basis for steep price increases for Fragrance Products.

201. Defendants achieved generally consistent price increases with their customers, despite such increases being historically difficult to obtain and keep. Defendants, as a result of collusive price-fixing conduct, achieved these price increases even after the cost of raw materials – the purported reason for price increases – declined or stabilized.

**F.    Defendants' Coordinated Price Increases Substantially Improved Their Profitability**

202.   Despite the Defendants' claims that their price increases served only to "offset higher costs,"[145] publicly available data indicate that many of the Defendants' earnings before interest, taxes, depreciation, and amortization ("EBITDA") and gross profits in fact increased during the Class Period, in some cases precipitously.

203.   For instance, as shown in the chart below, IFF's EBITDA surged from $160 million in Q4 2017 to $611 million in Q3 2022.[146]  Givaudan's EBITDA, meanwhile, increased rapidly from $496 million in H2 2017 to $810 million in H1 2022.[147]

---

[145]    Silke Koltrowitz, Givaudan to Accelerate Price Increases as Input Costs Hit Margins, https://www.reuters.com/business/retail-consumer/givaudan-confirms-mid-term-targets-works-pass-higher-prices-2022-07-21 (last updated July 21, 2022).

[146]    International Flavors and Fragrances – EBITDA, Trading Economics, https://tradingeconomics.com/iff:us:ebitda.

[147]    Givaudan – EBITDA, Trading Economics, https://tradingeconomics.com/givn:vx:ebitda.



Source: tradingeconomics.com

204.   Gross profits at IFF and Givaudan also increased over the Class Period. For IFF, gross profits rose from $356 million in Q4 2017 to $1 billion in Q3 2022.[148]  Givaudan's gross profits increased from $1.12 billion in H2 2017 to $1.46 billion in H1 2022.[149]

---

[148]   International Flavors and Fragrances – Gross Profit on Sales, Trading Economics, https://tradingeconomics.com/iff:us:gross-profit-on-sales.

[149]   Givaudan – Gross Profit on Sales, Trading Economics, https://tradingeconomics.com/givn:vx:gross-profit-on-sales.



205.    Givaudan and IFF boasted of their ability to record growth while continuously raising prices. In 2018, Givaudan highlighted the fact that "Fragrance Ingredients sales recorded growth, supported by price increases."[150] The next year, they again emphasized that the Fragrance Division obtained "[e]xcellent growth driven by the strong performance of new wins and price increases to compensate for higher input costs."[151]

---

[150]    Givaudan    "2018    Full    Year    Results"    (January    25,    2019), https://www.givaudan.com/files/giv-2018-fyr-presentation.pdf.

[151]    Givaudan    "2019    Full    Year    Results"    (January    24,    2020), https://www.givaudan.com/files/giv-2019-fyr-presentation.pdf.

206.   In 2018, IFF had its "strongest improvement in Fragrance Ingredients, which grew high-single digits, led by price increases."[152]  In 2023, IFF claimed "profitability driven by favorable net pricing & productivity" and as a result "[d]elivered higher than expected sales and EBITDA in Q3 2023 driven by improved volume, favorable price to inflation & productivity benefits."  Even when IFF saw a momentary dip in sales volume it was able to keep "margin stable as price increases and the benefits of productivity initiatives offset higher raw material costs."[153]

207.   Symrise experienced a similar surge in earnings and profits during the Class Period despite its claims of rising costs, with EBITDA increasing nearly 50% from €631 million in FY 2018 to €922 million in FY 2022.[154]

208.   Over the same period, Firmenich's adjusted EBITDA rose from 825.5 CHF to 904.5 CHF, while its unadjusted EBITDA remained flat at around 800 CHF.[155]

---

[152] "IFF Q4 & FY 2018 Earnings Conference Call", (February 14, 2018), (emphasis added) https://ir.iff.com/static-files/64efb9a0-b5e8-4aa7-a300-53e4f57de707.

[153] "Third Quarter 2023 Earnings Conference Call", (November 7, 2023), (emphasis added) https://ir.iff.com/static-files/e26b794e-c037-4a34-9381-e0361d7bf414.

[154]   Financial   Report   2022,   SYMRISE   (May   10,   2023), https://www.symrise.com/newsroom/downloads/.

[155]   Firmenich   Annual   Report   2022,   31, https://img06.en25.com/Web/FirmenichCorporateCenter1/%7B12ed0bb5-85e8-45e3-9d34-e4571c98cc26%7D_220805_FIRMENICH_AR_FY22.pdf#page=31.

209.    These increases in volume, EBITDA and profits during the relevant period are inconsistent with the Defendants' pretextual explanation that their price increases merely offset rising costs and are more consistent with the existence of a conspiracy to fix prices.

## G.    Defendants Restrained and Allocated the Supply of Key Fragrance Ingredients

210.    During the Class Period, Defendants restrained the supply of Fragrance Products.  Defendants agreed to each produce only a specific subset of Fragrance Products and not to produce other Fragrance Products produced by their competitors.  By doing so, Defendants ensured that when customers wanted to make a fragrance compound requiring a specific ingredient, only one or a limited number of Defendants would be able to do so.  This greatly restrained competition in the fragrance industry and allowed Defendants to increase prices above the levels that would otherwise have been set by a competitive market.

211.    By reaching this agreement, Defendants were able to nullify the competitive effects of Defendants' ability to reverse-engineer each other's fragrances.  So long as Defendants maintained a significant amount of non-overlapping fragrance ingredients, it would not matter if they could reverse-engineer each other's fragrance compounds because they would not have the ingredients to make those fragrances.  By agreeing not to produce certain fragrance

ingredients, Defendants restrained their ability to compete with each other by offering lower prices on specific fragrances.

212.   The plausibility of Defendants' conspiracy has been confirmed by scholars who have studied the fragrance industry.  As one scholar wrote in 2016, "Five multinational corporations, four of which originated in Western Europe, dominate the world fragrance market.  ***For years this industrial concentration fostered a tacit agreement among the industry's largest players.  Under this informal understanding, the major fragrance houses would not cannibalize each other by manufacturing competing products based on formulas of a competitor acquired through reverse engineering.***"[156]  This author went on to describe this understanding as a "***gentleman's agreement***," a term also used by Calice Becker — head of the International Society of Perfumers-Creators (ISPC), whose members are predominantly affiliated with Defendants — who has described the industry as characterized by "a sort of gentleman's agreement and unspoken rules."[157]

213.   Similarly, two other scholars have remarked on how the leading fragrance manufacturers have reached a "***non-appropriation consensus***" when it

---

[156] Charles Cronin, *Lost and Found: Intellectual Property of the Fragrance Industry; From Trade Secret to Trade Dress*, JIPEL (Feb. 2, 2016) (emphasis added), https://jipel.law.nyu.edu/vol-5-no-1-6-cronin/.

[157] *Id.*

comes to "olfactory creations" (with one of these scholars making this observation in an obscure, non-publicly available French-language source by no later than 2012), and have described the fragrance "industry" as "incestuous."[158]  At some point, this tacit agreement became express.  Indeed, Defendants' own employees and their co-conspirators have entered into public affirmations of this agreement not to compete.  For example, the December 2022 "Perfumery Code of Ethics," authored by a former IFF employee and counting among its signatories current and former employees of Defendants and their co-conspirators, states as its first maxim the following: "We pledge to create or promote original olfactory forms. Borrowed forms shall have their original creators and formula owners named and rewarded.  ***Plagiarism is not tolerated***."[159] (emphasis added).  Adherents to the Perfumery Code of Conduct have thus mutually and expressly agreed not to compete with one another over their respective fragrance formulas.  Likewise, the ISPC espouses a similar sentiment on its website: "We all copy and steal like artists – it's part of the creative process to understand how masterpieces are created, but

---

[158] Guillemin, *supra* note 18 at 25.

[159]   Perfumery   Code   of   Ethics,   v   23/2022-05   (emphasis   added), https://perfumeryethics.org/the-code/.

what's crucial is to know what we do with the copies. ***Have them on the market the way they are - is plagiarism.***"[160] (emphasis added).

214.   By only producing a specific subset of Fragrance Products, Defendants ensured that when customers wanted to make a fragrance requiring a specific ingredient, only one or a limited number of Defendants would be able to do so. For example, Symrise touts itself as the "No. 1 supplier of fragrance raw materials," but it lists only 207 fragrance ingredients on its website. IFF reports 255. And Firmenich discloses only 206. Finally, Givaudan lists only 176 fragrance ingredients. Each Defendant produces well fewer than the full universe of synthetic and natural fragrance ingredients that can be used to make fragrances. This limited competition in the market for Fragrance Products and, as a result, increased prices.

215.   What is more, Defendants produce different fragrance ingredients among the subset of fragrance ingredients that they produce. One could imagine an innocent explanation for Defendants producing only a subset of fragrance ingredients being that certain ingredients are more difficult to produce (or used less) and, therefore, all Defendants produce a similar subset of the overall fragrance ingredients. But that is not the case. Firmenich, Givaudan, IFF, and

---

[160] *ISPC Speaks at WPC 2022: Three Goals*, PERFUMEURS CREATEURS (Sept. 7, 2022) (emphasis added), https://www.perfumer-creators.com/en/news/ispc-speaks-at-wpc-2022-three-goals-71.

Symrise all publish their fragrance ingredients online. Excluding the fragrance ingredients that Defendants have trademarked, each Defendant produces a substantial number of fragrance ingredients that the other Defendants do not. For instance, IFF produces lavonax, khusinil, meth cyclocitrone, and myrcenyl acetate, but neither Givaudan nor Symrise produce any of those ingredients. Similarly, Givaudan produces methyl octyne carbonate, jasmacyclene, and isopropyl quinoline, but neither IFF nor Symrise produce them (even though they both produce isobutyl quinoline, which is chemically similar but distinct from isopropyl quinoline). And Symrise produces formyrcenol, dimethyl myrcetone, and ethyl propionate, yet again neither Givaudan nor IFF produce those ingredients. These are but a few illustrative examples.

216.   Defendants' failure to produce these fragrance ingredients is not a result of capacity limitations or capital restrictions.  Defendants are the largest fragrance ingredient manufacturers in the world and, as they themselves explain, use "cutting-edge chemistry and biotechnology" to develop their synthetic ingredients in order to launch "distinctive, high-performing products." Indeed, Givaudan explains that its research centers "synthesise nearly 2,000 new molecules every year," even though "[o]nly a small number of th[em] end up in [Givaudan's]

perfumers' palette."[161] Thus, it is clear that Defendants have the ***capability*** to produce substantially all of the synthetic and natural fragrance ingredients that are used to make fragrances and would enable them to offer their customers the full array of fragrance options.

217.    This explanation also comports with COMCO's statement in the aftermath of the dawn raids that it had reason to believe Defendants had "limited the production of certain fragrances." COMCO's announcement is further evidence that Defendants agreed to retrain the market to increase prices above competitive levels.

## H.    Government Authorities Conduct Dawn Raids On Defendants

218.    On March 7, 2023, the EC published the following announcement that it had carried out dawn raids at several suppliers and an industry association in the Fragrance Products industry:

> On 7 March 2023, the European Commission carried out unannounced inspections at the premises of companies and an association active in the fragrance industry in various Member States. In parallel, the Commission has sent out formal requests for information to several companies active in the same sector.

> The inspections and requests for information concern possible collusion in relation to the supply of fragrances and fragrance ingredients.  Fragrances are used in the manufacture of consumer products such as household and personal care products.

---

[161]    Givaudan, Shaping Tomorrow's Signature Fragrances with Science, *supra* note 24.

> The Commission has concerns that companies and an association in the fragrance industry worldwide may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union).
>
> The Commission has been in contact with the Antitrust Division of the US Department of Justice, the UK Competition and Markets Authority and the Swiss Competition Commission in relation to this matter and the inspections were conducted in consultation with them.   The Commission officials were accompanied by their counterparts from the national competition authorities of the Member States where the inspections were carried out.[162]

219.   Inspections by the EC are not undertaken casually. Inspections are typically done by an order of the EC, and the EC must have "reasonable grounds for suspecting an infringement of the competition rules;" "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information."[163]

220.   That same day, the CMA confirmed its participation in the investigation and named the Defendants as the subject of that investigation:

> The Competition and Markets Authority (CMA) has reason to suspect anti-competitive behaviour has taken place involving suppliers of

---

[162]   European Commission Press Release IP/23/1532, *supra* note 1.

[163]   Case No. T-135/09, *Nexans France SAS v. Comm'n*, 2012 E.C.R. 43, http://curia.europa.eu/juris/document/document_print.jsf?doclang=EN&text=&pageIndex=0&part=1&mode=lst&docid=129701&occ=first&dir=&cid=663482.

fragrances and fragrance ingredients for use in the manufacture of consumer products such as household and personal care products.

The businesses under investigation by the CMA are: Firmenich International SA, Givaudan SA, International Flavours & Fragrances Inc, and Symrise AG.

The CMA has been in contact with the Antitrust Division of the US Department of Justice, the European Commission and the Swiss Competition Commission in relation to this matter, and this investigation has been launched in consultation with them.[164]

221.   The next day, COMCO confirmed its involvement in the investigation

and provided further details regarding the conduct for which the Defendants were

under investigation:

**The Swiss Competition Commission (COMCO) has opened an investigation in the fragrance sector.  There are suspicions that producers have colluded**.

COMCO has indications that several undertakings active in the production of fragrances have violated cartel law.  There are suspicions that these undertakings have coordinated their pricing policy, prohibited their competitors from supplying certain customers and limited the production of certain fragrances.  Fragrances are used in the manufacture of many products, including in particular cosmetics, personal care products, detergents and cleaning products.  The undertakings involved in the investigation are Firmenich International SA (Geneva), Givaudan SA (Geneva), International Flavors & Fragrances Inc. (USA) et Symrise AG (Germany).

Dawn raids were conducted at various locations.  These were carried out in consultation with other competition authorities, namely the

---

[164]   *CMA Launches Investigation into Fragrances and Fragrance Ingredients*, *supra* note 2.

European Commission, the US Department of Justice Antitrust Division and the UK Competition and Markets Authority.[165]

222. IFF, Symrise, Givaudan, and Firmenich have all confirmed that they are subjects of the investigation.[166]

223. On March 7, 2023, Givaudan confirmed the investigation in a statement to Reuters:

> "I can confirm that we are part of an industry-wide investigation by European and Swiss authorities. As a good corporate citizen, Givaudan is fully cooperating with the authorities," a spokesperson said.[167]

224. On March 8, 2023, Symrise released a press release on its website confirming the investigation:

> On March 7, 2023, EU cartel authorities have contacted Symrise at their headquarters in Holzminden. Together with Swiss, British and American authorities, they are investigating possible inadmissible agreements in the fragrance and fragrance ingredients sector. These investigations are taking place in parallel at all leading companies in the industry. Symrise is cooperating fully with the authorities. At present, precise details and concrete content on this investigation are still pending.[168]

---

[165] The Swiss Competition Commission Press Release, *supra* note 3 (emphasis original).

[166] Patricia Nilsson & Javier Espinoza, *Top Four Fragrance Groups Raided in Co-Ordinated Antitrust Probe*, FINANCIAL TIMES (Mar. 8, 2023), https://www.ft.com/content/ebe2087e-198d-40dd-9615-e090facfb99f.

[167] Chee & Hirt, *supra* note 79.

[168] Press Release, Investigations by International Cartel Authorities (Mar. 08, 2023), https://www.symrise.com/newsroom/article/investigations-by-international-cartel-authorities/.

225.    That same day, Firmenich posted a press release to its corporate

website stating:

> Firmenich, the world's largest privately owned perfume and taste
> company confirms that on March 7th, 2023, certain competition
> authorities commenced an industry wide investigation into the
> fragrances sector.  As part thereof, unannounced inspections were
> carried out at its offices in France, Switzerland and the UK.
>
> Unannounced inspections are a preliminary step in anti-trust
> investigations into suspected infringements of competition rules.  This
> does not mean that the company has engaged in anti-competitive
> behavior nor does it prejudge the outcome of the investigation itself.
>
> Firmenich is closely monitoring the situation and is fully cooperating
> with the investigators.  The Company is unable to comment further at
> this stage.[169]

226.    Firmenich also stated in its 2023 Financial Statements, "On March 7,

2023, certain competition authorities commenced an industry-wide investigation

into the fragrances sector. As part thereof, unannounced inspections were carried

out at the Firmenich offices in France, Switzerland and the UK and Firmenich

received a subpoena from the Antitrust Division of the United States Department

of Justice."[170]

---

[169]    Press Release, Firmenich Confirms Anti-Trust Probes into Fragrances Sector
(Mar. 08, 2023), https://www.firmenich.com/company/press-release/firmenich-
confirms-anti-trust-probes-fragrances-sector.

[170]    Financial statements 2023: for the year ended June 30, 2023, Firmenich, at
48 (July 31, 2023), available at https://www.dsm-firmenich.com/content/dam/dsm-
firmenich/corporate/documents/firmenich-sa-annual-report-fy2023.pdf.

227.   In a May 10, 2023 SEC filing, IFF acknowledged the investigation

and disclosed that it had received a subpoena from the U.S. Department of Justice:

> On March 7, 2023, the European Commission ("EC") and the United
> Kingdom Competition and Markets Authority ("CMA") carried out
> unannounced inspections of certain of IFF's facilities.  On the same
> day, IFF was served with a grand jury subpoena by the Antitrust
> Division of the U.S. Department of Justice ("DOJ").  IFF understands
> the EC, CMA, DOJ and the Swiss Competition Commission to be
> investigating potential anticompetitive conduct as it relates to IFF's
> fragrance businesses.[171]

228.   In an article published March 8, 2023, a spokesperson for IFF told

Bloomberg that "they were working closely with the relevant authorities."[172]

229.   The subpoena in question was issued by a criminal grand jury.  This

indicates that the DOJ is considering a criminal prosecution against IFF and/or its

co-conspirators, as reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust

Division Manual. Section F.1 of that chapter notes that "staff should consider

carefully the likelihood that, if a grand jury investigation developed evidence

confirming the alleged anticompetitive conduct, the Division would proceed ***with a***

---

[171]   International Flavors & Fragrances, Inc., Quarterly Report (Form 10-Q), at
25 (May 10, 2023), https://fintel.io/doc/sec-international-flavors-fragrances-inc-
51253-10q-2023-may-10-19487-5246.

[172]   Stephanie Bodoni & Lisa Pham, *Fragrance Firms Hit in Europe Suspected
of Scent Supply Cartel*, BLOOMBERG (Mar. 8, 2023),
https://www.bloomberg.com/news/articles/2023-03-08/fragrance-firms-hit-in-
europe-suspected-of-scent-supply-cartel#xj4y7vzkg.

*criminal prosecution*."[173] The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys general who will participate in the grand jury investigation."[174] Further, "[t]he investigation should be conducted by a grand jury in a judicial district from or to which venue lies for the offense, such as a district where the price-fixed sales were made or where conspiratorial communications occurred."[175]

230.   On January 11, 2024, IFF announced that its Chief Executive Officer and Director, Franklin K. Clyburn, Jr., would cease to serve as CEO and a director of the Board, effective February 6, 2024. Clyburn's Separation Agreement with IFF requires him to acknowledge that IFF is "involved in various proceedings launched in March 2023 by certain competition and enforcement authorities in the United States, United Kingdom, Switzerland and before the EU Commission . . . and . . .

---

[173]   U.S. Dep't of Just., Antitrust Division Manual, Chapter III § F1, at 82, (5th ed., Last Updated April 2015), (emphasis added), https://www.justice.gov/sites/default/files/atr/legacy/2015/05/13/chapter3.pdf.

[174]   *Id.* at 83.

[175]   *Id.*

may be involved in other procedures conducted by other competition or

enforcement authorities . . . in other jurisdictions for similar facts. (together, the

'Investigation')."[176] Under his Separation Agreement, Clyburn has to "fully and

promptly cooperate in good faith with the Company, the Group Companies and

their legal counsel in any matter concerning the Investigation" and "in connection

with any claim or court action brought against the Company or any Group

Company in whole or in part for any alleged violation of the antitrust laws

("Derivative Actions"), including, but not limited to, providing testimony at trial or

deposition, in compliance with applicable laws."[177]

231.   On top of having to cooperate with IFF, Clyburn's Separation

Agreement prohibits him from cooperating with claimants against IFF related to its

anticompetitive conduct. Clyburn has held his post with IFF since January 18,

2022.

232.   Further demonstrating that Defendants commitment to coordination

rather than competition, the CMA is investigating Defendants Firmenich, IFF, and

Givaudan for entering into "No Poach" agreements concerning their employees.

By agreeing not to hire each other's employees, Specifically, the CMA revealed

---

[176]   International Flavors & Fragrances Inc., Current Report (Form 8-K Filing),
Exhibit 10.1, Separation Agreement and General Release (January 11, 2024).

[177]   *Id.*

that it was investigating "unlawful coordination by Firmenich International SA,

Givaudan SA and International Flavours & Fragrances Inc involving reciprocal

arrangements relating to the hiring or recruitment of certain staff involved in the

supply of fragrances and/or fragrance ingredients."[178]

## V.    PLAINTIFFS' CLAIMS ARE TIMELY

### A.    Continuing Violation

233.   During the Class Period, Defendants' conspiracy was a continuing

violation in which Defendants repeatedly invaded Plaintiffs' and Class Members'

interests by adhering to, enforcing, and reaffirming the anticompetitive agreement

described herein.

234.   Defendants' continuing adherence to, enforcement of, and

reaffirmation of the anticompetitive agreement throughout the Class Period was

and is consummated through, among other conspiratorial acts, repeatedly selling to

manufacturers of products containing Fragrances Products at artificially inflated

prices, communicating with each other to discuss the terms of and continued

adherence to the conspiracy, and continually refusing to compete for each other's

customers, to ensure sales at artificially inflated rates.

---

[178]    *Suspected anti-competitive conduct in relation to fragrances and fragrance ingredients (51257)*, *Supra* note 7.

**B.     Fraudulent Concealment**

235.   Plaintiffs and other Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief until at least March 7, 2023, when the EC announced its investigation into Defendants' anticompetitive conduct. Plaintiffs and other Class Members similarly were not on notice that the DOJ had opened a criminal grand jury investigation into IFF until IFF publicly announced in May 2023 that it had been served with a grand jury subpoena. Moreover, the scholarly commentary cited herein describing Defendants' anticompetitive conduct was published in obscure academic books and articles, including in foreign languages, and describes only a "tacit," not explicit, agreement among the Defendants. And the public commitments by Defendants not to "plagiarize" one another's work cited herein were made only in 2022. Furthermore, many sources of industry news and information, including many cited in this Complaint, are behind paywalls and thus generally inaccessible to the broader public. Thus, Plaintiffs and other Class Members did not and could not have known about Defendants' anticompetitive agreement until shortly before filing this Complaint, or at the very earliest in 2022. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Classes on inquiry notice that there was a conspiracy to allocate products and customers and inflate the prices of Fragrance Products in the United States.

236.   Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Fragrance manufacturers are not exempt from antitrust regulation, and thus, Plaintiffs and the Classes reasonably considered the fragrance industry to be competitive until recently. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate on the prices paid by manufacturers of products containing Fragrances Products in the United States.

237.   Plaintiffs exercised reasonable diligence. Plaintiffs and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and co-conspirators to conceal their combination.

238.   Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the other Class Members.

239.   The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, Defendants' repeated public statements that they offered competitive prices—e.g., that they offer prices set by competitive forces in the market rather than by the anticompetitive agreement alleged herein. During the Class Period, Defendants

affirmatively and falsely represented that they set competitive prices for fragrances products. As just one example, Givaudan repeatedly stated in its 2022 Annual Report that it had to avoid certain operational risks that would prevent it from delivering products at "competitive prices"—implying that it otherwise does set its prices for Fragrance Products competitively. Similarly, Givaudan stated in that same report that the fragrance industry is a "competitive and dynamic environment." And IFF has stated that it aims to create "not only innovative, but also cost-effective [Fragrance] ingredients."

240.   These false representations were used to conceal the conspiracy.

241.   By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class Members have based on the unlawful combination and conspiracy alleged in this Complaint.

## VI.   CLASS ACTION ALLEGATIONS

242.   Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b)(2) seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> **Nationwide Class:** All persons and entities in the United States who, during the Class Period, purchased consumer

products or household goods, not for resale, which
contained Fragrances Products that were manufactured or
sold by Defendants, any current or former subsidiary of
Defendants, or any co-conspirator of Defendants.

243.   Plaintiffs also bring this action on behalf of themselves, and as a class

action under the Federal Rules of Civil Procedure, Rule 23(a) and (b)(3) seeking

damages pursuant to antitrust, unfair competition, and consumer protection laws as

well as common law unjust enrichment on behalf of the following Class (the

"Damages Class"):

> **Damages Class:** All persons or entities in the End-User
> States who, during the Class Period, [179] purchased
> consumer products or household goods, not for resale,
> which contained Fragrances Products that were
> manufactured or sold by Defendants, any current or
> former subsidiary of Defendants, or any co-conspirator of
> Defendants.

244.   The Nationwide Class and Damages Class are referred to collectively

as the "Classes" and members of both classes are collectively referred to as "Class

Members" unless otherwise indicated. The following persons and entities are

excluded from the proposed Classes: Defendants, co-conspirators, and any of their

subsidiaries, predecessors, officers, or directors; federal, state, or local

governmental entities; and the court and any of its staff.

---

[179] The End-User Purchaser States are the states listed in the Second and Third
Claims for Relief.

245.   The Class definitions provide clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Classes.

246.   Subject to additional information obtained through further investigation and discovery, the Class definitions may be expanded or narrowed.

247.   The Classes are so numerous that joinder of all members of the Classes in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Classes contain millions of similarly situated customers.

248.   The Classes are readily identifiable and are ones for which records should exist.

249.   Plaintiffs' claims are typical of those of the Classes. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Classes, and the relief sought is common to the Classes.

250.   Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in value for consumer products containing Fragrance Products (by overpaying for those products) than they would have in a competitive market.

251. Plaintiffs will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiffs are aligned with, and not antagonistic to, the Classes.

252. Questions of law and fact common to Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to Class Members.

253. Questions of law and fact common to the Classes include:

- Whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the prices paid for Fragrance Products;

- Whether Defendants engaged in an agreement, combination, or conspiracy to allocate their customers for Fragrance Products and engaged in an agreement, combination, or conspiracy to allocate those products;

- Whether such agreements constituted violations of the Sherman Antitrust Act;

- Whether such agreements constituted violations of the End-User Purchaser States' unfair competition, consumer protection and unjust enrichment laws;

- The identity of the participants of the alleged conspiracy;

- The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

- Whether Defendants fraudulently concealed their misconduct;

- Whether and to what extent Defendants' anticompetitive scheme inflated prices of Fragrance Products above competitive levels;

- The extent that any overcharge was passed through to Plaintiffs and Class Members;

- The nature and scope of injunctive relief necessary to restore competition; and

- The measure of damages suffered by Plaintiffs and the Damages Class.

254.   Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

255.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Classes compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Classes to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Classes is impractical, and the prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with

a method of obtaining redress for claims that are not practicable for them to pursue

individually, substantially outweigh any difficulties that may arise in management

of this class action.

256.   Defendants have acted on grounds generally applicable to the Classes,

thereby making final injunctive relief appropriate with respect to the Classes as a

whole.

## VII.   CLAIMS FOR RELIEF

## COUNT 1: VIOLATION OF § 1 OF THE SHERMAN ACT (15 U.S.C. § 1)
### (On Behalf of Plaintiff and the Nationwide Class for Injunctive and Equitable Relief)

257.   Plaintiffs incorporate by reference the allegations in the preceding

paragraphs.

258.   Defendants are direct competitors in the Fragrance Products market

throughout the United States.

259.   Beginning at least as early as January 1, 2018 and continuing through

the present, Defendants entered into a continuing contract, combination, and/or

conspiracy with respect to the sale of Fragrance Products in unreasonable restraint

of trade and commerce and in violation of Section 1 of the Sherman Act (15 U.S.C.

§ 1).

260.   The contract, combination, and/or conspiracy consisted of an

agreement among the Defendants and their co-conspirators to fix, raise, inflate,

stabilize and/or maintain artificially supra-competitive prices for Fragrance
Products.

261.   In formulating and effectuating this conspiracy, Defendants and their
co-conspirators performed acts in furtherance of the combination and conspiracy,
including:

> a) Participating in meetings and conversations among themselves in
> the United States and elsewhere during which they agreed to price
> Fragrances at certain levels, and otherwise to fix, increase, inflate,
> maintain, and/or stabilize effective prices for one or more
> Fragrance Products incorporated into consumer products purchased
> by Plaintiff and Nationwide Class Members in the United States;
>
> b) Participating in meetings and conversations among themselves in
> the United States and elsewhere to implement, adhere to, and
> enforce the unlawful agreements they reached.

262.   Defendants and their co-conspirators engaged in the actions described
above for the purpose of carrying out their unlawful agreements to fix, maintain,
increase, or stabilize prices with respect to Fragrance Products.

263.   Defendants' anticompetitive acts described above were knowing,
willful, and constitute a per se violation of Section 1 of the Sherman Act (15
U.S.C. § 1) and were an unreasonable and unlawful restraint of trade.

264.    There is no legitimate business justification for, or pro-competitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any proffered business justification or asserted pro-competitive benefits would be pretextual, outweighed by the anticompetitive effects of Defendants' conduct, and could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

265.    The injury to Plaintiffs and the Nationwide Class is of the type that antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.

266.    Plaintiffs and the Nationwide Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

267.    Plaintiffs and Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### COUNT 2: VIOLATION OF THE STATE ANTITRUST STATUTES
### (On Behalf of Plaintiff and the Damages Class)

268.    Plaintiffs incorporates by reference the allegations in the preceding paragraphs.

269.    During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of Fragrance Products in

unreasonable restraint of trade in commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

270.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Fragrance Products.

271.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End Users in the Damages Class who purchased products containing Fragrance Products have been harmed by being forced to pay artificially-inflated, supra-competitive prices for products containing Fragrance Products.

272.    By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws pleaded below.

273.    **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1402, et seq. with respect to purchases of products containing Fragrance Products in Arizona by Plaintiffs Maria Barron and Jessica Howe and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in Arizona at the time of their purchase.

        c)    Defendants' combination or conspiracy had the following effects: (1) Fragrances price competition was restrained, suppressed, and

eliminated throughout Arizona; (2) Fragrance Products prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs Maria Barron and Jessica Howe and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Maria Barron and Jessica Howe and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

d) During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Maria Barron and Jessica Howe and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e) Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, et seq. Accordingly, Plaintiffs Maria Barron and Jessica Howe and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1402, et seq.

274. **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. And Prof. Code, §§ 16720, et seq. with respect to purchases of products containing Fragrance Products in California by Plaintiffs Masees Skenderian, Alethea Andrews and Nicole Padilla and members of

the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in California at the time of their purchases.

a) During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of Fragrance Products at supra-competitive levels.

b) The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Fragrance Products.

c) For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above including fixing, raising, stabilizing, and pegging the price of Fragrance Products.

d) The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition in the sale of Fragrance Products has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Fragrance Products sold by Defendants have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased products containing Fragrance Products have been deprived of the benefit of free and open competition.

e) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Masees Skenderian, Alethea Andrews and Nicole Padilla and members of the Damages Class have been injured in their business and property in that they paid more for products containing Fragrance Products than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs Masees Skenderian, Alethea Andrews and Nicole Padilla and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

-112-

275. **Colorado:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Col. Rev. Stat. Ann. §§6-4-104, et seq. with respect to purchases of products containing Fragrance Products in Colorado by Plaintiffs Charlette Atencio and Dana Evans and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in Colorado at the time of their purchase.

    a) Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Colorado; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs Charlette Atencio and Dana Evans and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Charlette Atencio and Dana Evans and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

    b) During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce.

    c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Charlette Atencio and Dana Evans and members of the

Damages Class have been injured in their business and property and
are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements
in restraint of trade in violation of Col. Rev. Stat. Ann. §§6-4-104, et
seq. Accordingly, Plaintiffs Charlette Atencio and Dana Evans and
members of the Damages Class seek all forms of relief available
under Col. Rev. Stat. Ann. §§6-4-104, et seq.

276.  **Connecticut**: Defendants have entered into an unlawful agreement in
restraint of trade in violation of Conn. Gen. Stat. Ann. §§ 35-26, et seq. with
respect to purchases of products containing Fragrance Products in Connecticut by
Plaintiffs Matthew DeNapoles and Havva Murtishi and members of the Damages
Class and/or purchases of products containing Fragrance Products by members of
the Damages Class who resided in Connecticut at the time of their purchases.

a) Defendants' combination or conspiracy had the following effects: (1)
Fragrance Product price competition was restrained, suppressed, and
eliminated throughout Connecticut; (2) Fragrance Product prices were
raised, fixed, maintained, and stabilized at artificially high levels
throughout Connecticut; (3) Plaintiffs Matthew DeNapoles and Havva
Murtishi and members of the Damages Class were deprived of free
and open competition; and (4) Plaintiffs Matthew DeNapoles and

Havva Murtishi and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Matthew DeNapoles and Havva Murtishi and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. Ann. §§ 35-26, et seq. Accordingly, Plaintiffs Matthew DeNapoles and Havva Murtishi and members of the Damages Class seek all forms of relief available under Conn. Gen. Stat. Ann. §§ 35-26, et seq.

277. **District of Columbia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code Ann. §§ 28-4502, et seq. with respect to purchases of products containing Fragrance Products in the District of Columbia by Plaintiff Eleanor Pressler and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the

Damages Class who resided in the District of Columbia at the time of their purchases.

a)  Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff Eleanor Pressler and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Eleanor Pressler and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

b)  During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

c)  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Eleanor Pressler and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d)  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4502, et seq. Accordingly, Plaintiff Eleanor Pressler and members

of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4502 et seq.

278. **Hawaii:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Red. Stat. § 480-1, et seq. with respect to purchases of products containing Fragrance Products in Hawaii by Plaintiffs Alana Manuia and Elli Ward and members of the Damages Class and/or purchases of products containing Fragrance Products by Plaintiffs Alana Manuia and Elli Ward and members of the Damages Class who resided in Hawaii at the time of their purchases.

   a) Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs Alana Manuia and Elli Ward and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

   b) During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

   c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Alana Manuia and Elli Ward and members of the Damages

Class have been injured in their business and property and are
threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements
in restraint of trade in violation of Haw. Code § 480-1, et seq.
Accordingly, Plaintiffs Alana Manuia and Elli Ward and members of
the Damages Class seek all forms of relief available under Haw. Code
§ 480-1, et seq.

279. **Illinois**: Defendants have entered into an unlawful agreement in
restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/1, et seq. with respect
to purchases of products containing Fragrance Products in Illinois by Plaintiffs
Suzen Isai, Joseph Collins and Samuel Johnson and members of the Damages
Class and/or purchasers of products containing Fragrance Products by members of
the Damages Class who resided in Illinois at the time of their purchases.

a) Defendants' combination or conspiracy had the following effects: (1)
Fragrance Product price competition was restrained, suppressed, and
eliminated throughout Illinois; (2) Fragrance Product prices were
raised, fixed, maintained, and stabilized at artificially high levels
throughout Illinois; (3) Plaintiffs Suzen Isai, Joseph Collins and
Samuel Johnson and members of the Damages Class were deprived of
free and open competition; and (4) Plaintiffs Suzen Isai, Joseph

Collins and Samuel Johnson and members of the Damages Class paid supracompetitive, artificially inflated prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Suzen Isai, Joseph Collins and Samuel Johnson and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/1, et seq. Accordingly, Plaintiffs Suzen Isai, Joseph Collins and Samuel Johnson and members of the Damages Class seek all forms of relief available under 740 Ill. Comp. Stat. Ann. 10/1, et seq.

280. **Iowa**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.4, et seq. with respect to purchases of products containing Fragrance Products in Iowa by Plaintiffs Shan Greer and Nancy Koepke and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in Iowa at the time of their purchases.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs Shan Greer and Nancy Koepke and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Shan Greer and Nancy Koepke and  members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Shan Greer and Nancy Koepke and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.4, et seq. Accordingly, Plaintiffs Shan Greer and Nancy Koepke and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.4, et seq.

281.  **Kansas**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, et seq. with respect to purchases of products containing Fragrance Products in Kansas by Plaintiff Brian Depperschmidt and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in California at the time of their purchases.

   a) Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiff Brian Depperschmidt and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Brian Depperschmidt and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

   b) During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

   c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Brian Depperschmidt and members of the Damages Class

have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, et seq. Accordingly, Plaintiff Brian Depperschmidt and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, et seq.

282. **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. 10 §§ 1101, et seq. with respect to purchases of products containing Fragrance Products by members of the Damages Class and/or purchases of products containing Fragrance Products by Plaintiffs Isaac Landreth and Scott Carpenter and members of the Damages Class who resided in Maine at the time of their purchases.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Maine; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs Isaac Landreth and Scott Carpenter and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Isaac Landreth and Scott Carpenter and

members of the Damages Class paid supra-competitive, artificially

inflated prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct substantially

affected Maine commerce.

c) As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs Isaac Landreth and Scott Carpenter and members of the

Damages Class have been injured in their business and property and

are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements

in restraint of trade in violation of Me. Rev. Stat. Ann.10, §§ 1101, et

seq. Accordingly, Plaintiffs Isaac Landreth and Scott Carpenter and

members of the Damages Class seek all relief available under Me.

Rev. Stat. Ann. 10, §§ 1101, et seq.

283.   **Michigan**: Defendants have entered into an unlawful agreement in

restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.772, et seq. with

respect to purchases of products containing Fragrance Products in Michigan by

Plaintiffs Mirlinda Elmazi and Frank Novak and members of the Damages Class

and/or purchases of products containing Fragrance Products by members of the

Damages Class who resided in Michigan at the time of their purchases.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Fragrance Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs Mirlinda Elmazi and Frank Novak and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Mirlinda Elmazi and Frank Novak and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c) As a direct and proximate result of Defendants' conduct, Plaintiffs Mirlinda Elmazi and Frank Novak and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreement in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.772, et seq. Accordingly, Plaintiffs Mirlinda Elmazi and Frank Novak and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.772, et seq.

284.   **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §§ 325D.51, et seq. with respect to purchases of products containing Fragrance Products in Minnesota by Plaintiff Andrea Hogan and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in Minnesota at the time of their purchases.

    a) Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Fragrance Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff Andrea Hogan and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Andrea Hogan and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

    b) During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

    c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Andrea Hogan and members of the Damages Class have been

injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.51, et seq. Accordingly, Plaintiff Andrea Hogan and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.51, et seq.

285. **Mississippi**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code Ann §§ 75-21-3, et seq. with respect to purchases of products containing Fragrance Products in Mississippi by Plaintiffs Apostle Cynthia Bolden, Brandy Littrell and Tiffnie Kitchens and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in Mississippi at the time of their purchases.

a) Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs Apostle Cynthia Bolden, Brandy Littrell and Tiffnie Kitchens and members of the Damages Class were

deprived of free and open competition; and (4) Plaintiffs Apostle Cynthia Bolden, Brandy Littrell and Tiffnie Kitchens and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Apostle Cynthia Bolden, Brandy Littrell and Tiffnie Kitchens and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-3, et seq. Accordingly, Plaintiffs Apostle Cynthia Bolden, Brandy Littrell and Tiffnie Kitchens and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75- 21-3, et seq.

286. **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Code Ann. §§ 59-801, et seq. with respect to purchases of products containing Fragrance Products in Nebraska by Plaintiff Jasmine Judy and members of the Damages Class and/or purchases of products

containing Fragrance Products by members of the Damages Class who resided in Nebraska at the time of their purchases.

    a)  Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff Jasmine Judy and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Jasmine Judy and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

    b)  During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

    c)  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Jasmine Judy and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d)  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, et seq. Accordingly, Plaintiff Jasmine Judy and members of the

Damages Class seek all relief available under Nebraska Revised
Statutes §§ 59-801, et seq.

287.   **Nevada**: Defendants have entered into an unlawful agreement in
restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.060, et seq. with
respect to purchases of products containing Fragrance Products in Nevada by
Plaintiffs Terry Brown, Kionna Love and Paula DiCianno and members of the
Damages Class and/or purchases of products containing Fragrance Products by
members of the Damages Class who resided in Nevada at the time of their
purchases.

    a)  Defendants' combination or conspiracy had the following effects: (1)
Fragrance Product price competition was restrained, suppressed, and
eliminated through Nevada; (2) Fragrance Product prices were raised,
fixed, maintained and stabilized at artificially high levels throughout
Nevada; (3) Plaintiffs Terry Brown, Kionna Love and Paula DiCianno
and members of the Damages Class were deprived of free and open
competition; and (4) Plaintiffs Terry Brown, Kionna Love and Paula
DiCianno and members of the Damages Class paid supra-competitive,
artificially inflated prices for products containing Fragrance Products.

    b)  During the Class Period, Defendants' illegal conduct substantially
affected Nevada commerce.

    c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Terry Brown, Kionna Love and Paula DiCianno and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.060, et seq. Accordingly, Plaintiffs Terry Brown, Kionna Love and Paula DiCianno and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.060, et seq.

288.  **New Hampshire**: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. Rev. Stat. Ann. §§ 356.2, et seq., with respect to purchases of products containing Fragrance Products in New Hampshire by Plaintiff Berniece Van Der Berg and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in New Hampshire at the time of their purchases.

    a) Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially throughout New Hampshire, (3) Plaintiff Berniece Van Der Berg and members of

the Damages Class were deprived of free and open competition; and

(4) Plaintiff Berniece Van Der Berg and members of the Damages

Class paid supra-competitive, artificially inflated prices for products

containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct substantially

affected New Hampshire commerce.

c) As a direct and proximate result of Defendants' unlawful conduct,

Plaintiff Berniece Van Der Berg and members of the Damages Class

have been injured in their business and property and are threatened

with further injury.

d) By reason of the foregoing, Defendants have entered into agreements

in restraint of trade in violation of New Hampshire Revised Statutes

§§ 356.2, et seq. Accordingly, Plaintiff Berniece Van Der Berg and

members of the Damages Class seek all relief available under New

Hampshire Revised Statutes §§ 356:2, et seq.

289.   **New Mexico**: Defendants have entered into an unlawful agreement in

restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, et seq. with respect to

purchases of products containing Fragrance Products in New Mexico by Plaintiffs

Jodie Elmore and Milan Montano and members of the Damages Class and/or

purchases of products containing Fragrance Products by members of the Damages Class who resided in New Mexico at the time of their purchases.

    a)  Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially inflated prices for Fragrances.

    b)  During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

    c)  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Jodie Elmore and Milan Montano and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d)  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. S§ 57-1-1, et seq. Accordingly, Plaintiffs Jodie Elmore and Milan Montano and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, et seq.

290.  **New York**: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. L. §§ 340, et seq. with respect to

purchases of products containing Fragrance Products in New York by Plaintiff Daniel Nabavian and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in New York at the time of their purchases.

    a) Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout New York; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff Daniel Nabavian and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Daniel Nabavian and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products, or purchased products that were otherwise of lower quality than they would have been absent the conspirators illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

    b) During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

    c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Daniel Nabavian and members of the Damages Class have

been injured in their business and property and are threatened with

further injury.

d) By reason of the foregoing, Defendants have entered into agreements

in restraint of trade in violation of the New York Donnelly Act §§ 340,

et seq. The conduct set forth above is a per se violation of the Act.

Accordingly, Plaintiff Daniel Nabavian and members of the Damages

Class seek all relief available under New York Gen. Bus. Law §§ 340,

et seq.

291.   **North Carolina**: Defendants have entered into an unlawful agreement

in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, et seq. with respect to

purchases of products containing Fragrance Products in North Carolina by

Plaintiffs Letia Dickerson, Kimberly Webb and Sophia Dashab and members of the

Damages Class and/or purchases of products containing Fragrance Products by

members of the Damages Class who resided in North Carolina at the time of their

purchases.

a) Defendants' combination or conspiracy had the following effects: (1)

Fragrance Product price competition was restrained, suppressed, and

eliminated throughout North Carolina; (2) Fragrance Product prices

were raised, fixed, maintained, and stabilized at artificially high levels

throughout North Carolina; (3) Plaintiffs Letia Dickerson, Kimberly

Webb and Sophia Dashab and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Letia Dickerson, Kimberly Webb and Sophia Dashab and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c) As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs Letia Dickerson, Kimberly Webb and Sophia Dashab and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, et seq. Accordingly, Plaintiffs Letia Dickerson, Kimberly Webb and Sophia Dashab and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, et seq.

292. **Oregon**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases of products containing Fragrance Products in Oregon by Plaintiffs Mandy Bryant and Nicole Langlo and members of the Damages Class and/or

purchases of products containing Fragrance Products by members of the Damages Class who resided in Oregon at the time of their purchases.

a) Defendants' combination and conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs Mandy Bryant and Nicole Langlo and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Mandy Bryant and Nicole Langlo and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Mandy Bryant and Nicole Langlo and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, et seq. Accordingly, Plaintiffs Mandy Bryant and Nicole

-136-

Langlo and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, et seq.

293. **South Dakota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of S.D. Codified Laws An. §§ 37-1, et seq. with respect to purchases of products containing Fragrance Products in South Dakota by Plaintiff Casey Christensen and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in South Dakota at the time of their purchases.

    a) Defendants' combination or conspiracy had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Fragrance Product prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff Casey Christensen and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Casey Christensen and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

    b) During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

-137-

c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Casey Christensen and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws An. §§ 37-1, et seq. Accordingly, Plaintiff Casey Christensen and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, et seq.

294.   **Tennessee**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, et seq. with respect to purchases of products containing Fragrance Products in Tennessee by Plaintiff Yvonne Peychal and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in Tennessee at the time of their purchases.

a) Defendants' combination or conspiracy had the following effects:

(1) Fragrances price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Fragrances prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff Yvonne Peychal and members

of the Damages Class were deprived of free and open

competition; and (4) Plaintiff Yvonne Peychal and members of

the Damages Class paid supra-competitive, artificially inflated

prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct had a substantial

effect on Tennessee commerce.

c) As a direct and proximate cause of the Defendants' unlawful conduct,

Plaintiff Yvonne Peychal and members of the Damages Class have

been injured in their business and property and are threatened with

further injury. By reason of the foregoing, Defendants have entered

into agreements in restraint of trade in violation of Tennessee Code

Ann. §§ 47-25-101, et seq. Accordingly, Plaintiff Yvonne Peychal and

members of the Damages Class seek all relief available under

Tennessee Code Ann. §§ 47-25-101, et seq.

295. **Utah**: Defendants have entered into an unlawful agreement in

restraint of trade in violation of Utah Code Ann. §§ 76-10-3101, et seq. with

respect to purchases of products containing Fragrance Products in Utah by Plaintiff

Stephen Mack and members of the Damages Class and/or purchases of products

containing Fragrance Products by members of the Damages Class who resided in

Utah at the time of their purchases.

a) Defendants' combination or conspiracy had the following effects:

(1) Fragrances price competition was restrained, suppressed, and eliminated throughout Utah; (2) Fragrances prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiff Stephen Mack and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Stephen Mack and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

c) As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiff Stephen Mack and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, et seq. Accordingly, Plaintiff Stephen Mack and members of the Damages Class seek all relief available under Utah Code Ann. §§ 76-10-3101, et seq.

296.   **West Virginia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of W. Va. Code §§ 47-18-4, et seq. with respect to purchases of products containing Fragrance Products in West Virginia by Plaintiffs Leslee Martin and Michele Matheny and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in West Virginia at the time of their purchases.

a)  Defendants' combination or conspiracy had the following effects:

(1) Fragrances Product price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Fragrances Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs Leslee Martin and Michele Matheny and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Leslee Martin and Michele Matheny and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

b)  During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c)  As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Leslee Martin and Michele Matheny and members of the

Damages Class have been injured in their business and property and are threatened with further injury.

d)  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, et seq. Accordingly, Plaintiffs Leslee Martin and Michele Matheny and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, et seq.

297.  **Wisconsin**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §§ 133.01, et seq. with respect to purchases of products containing Fragrance Products in Wisconsin by Plaintiff Sandra Kluessendorf and members of the Damages Class and/or purchases of products containing Fragrance Products by members of the Damages Class who resided in Wisconsin at the time of their purchases.

a)  Defendants' combination or conspiracy had the following effects:

(1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Fragrance Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff Sandra Kluessendorf and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Sandra

Kluessendorf and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c) As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiff Sandra Kluessendorf and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, et seq. Accordingly, Plaintiff Sandra Kluessendorf and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, et seq.

## COUNT 3: VIOLATION OF STATE CONSUMER PROTECTION LAW
### (On Behalf of Plaintiff and the Damages Class)

298. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

299. During the Class Period, Defendants engaged in unfair or deceptive acts or practices in violation of the state deceptive trade practices and consumer protection laws pleaded below.

-143-

300.  **Arkansas**: Defendants have engaged in unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-101, et seq.

a)  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, raising, controlling, maintaining, and/or stabilizing at non-competitive and artificially inflated levels, the prices at which Fragrance Products were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs Phyllis Jackson and Jennifer McGehee and members of the Damages Class.

b)  Defendants' conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

c)  Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs Phyllis Jackson and Jennifer McGehee and members of the Damages Class were deprived of free and open competition; (4) Plaintiffs Phyllis Jackson and Jennifer McGehee and

members of the Damages Class paid supra-competitive, artificially

inflated prices for products containing Fragrance Products.

d)  During the Class Period, Defendants' illegal conduct had a substantial

effect on Arkansas commerce.

e)  As a direct and proximate cause of the Defendants' unlawful conduct,

Plaintiffs Phyllis Jackson and Jennifer McGehee and members of the

Damages Class have been injured in their business and property and

are threatened with further injury.

f)  By reason of the foregoing, Defendants have engaged in unfair or

deceptive acts of practices in violation of Ark. Code Ann. § 4-88-

107(a)(10). Accordingly, Plaintiffs Phyllis Jackson and Jennifer

McGehee and members of the Damages Class seek all relief available

under Ark. Code Ann. § 4-88-107(a)(10).

301.  **California**: Defendants have engaged in unfair or deceptive acts or

practices in violation of Cal. Bus. & Prof. Code § 17200, et seq.

a)  Defendants knowingly agreed to, and did in fact, act in restraint of

trade or commerce by affecting, fixing, raising, controlling,

maintaining, and/or stabilizing at non-competitive and artificially

inflated levels, the prices at which Fragrance Products were sold,

distributed, or obtained in California and exercised their collective control to suppress innovation and consumer choice.

b)  Defendants took efforts to conceal their agreements from Plaintiffs Masees Skenderian, Alethea Andrews and Nicole Padilla and members of the Damages Class.

c)  The claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution form these Defendants for acts as alleged herein that violated Section 17200 of the California Business and Professional Code, commonly known as the Unfair Competition Law (the "UCL").

d)  Defendants' conduct as alleged herein violates the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business accts or practices within the meaning of UCL, including, but not limited to, the following: the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, et seq., of the California Business and Professions Code, set forth above.

e)  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, et seq., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent.

f)  Defendants' acts or practices are unfair to consumers of products containing Fragrance Products in California within the meaning of Section 17200, California Business and Professions Code.

g)  Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

h)  During the Class Period, Defendants' illegal conduct had a substantial effect on California commerce.

i)  The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

j)  As a direct and proximate cause of the Defendants' unlawful and unfair business practices, Plaintiffs Masees Skenderian, Alethea Andrews and Nicole Padilla and members of the Damages Class have and continue to pay supra-competition and artificially inflated prices

for products containing Fragrance Products. Plaintiffs Masees Skenderian, Alethea Andrews and Nicole Padilla and Members of the Damages Class have been injured in their business and property and are threatened with further injury as a result of such unfair competition.

k) As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct. Accordingly, Plaintiffs Masees Skenderian, Alethea Andrews and Nicole Padilla and members of the Damages class seek all relief available under Cal. Bus. & Prof. Code § 17200, et seq.

302. **District of Columbia**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, et seq.

a) Plaintiff Eleanor Pressler and members of the Damages class purchased products containing Fragrance Products in the District Columbia or resided in the District of Columbia when they purchased products containing Fragrance Products for personal, family, or household purposes.

b) Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at

artificial and/or non-competitive levels, the prices at which Fragrance

Products were sold, distributed, or obtained in the District of

Columbia.

c) The foregoing conduct constitutes "unlawful trade practices," within

the meaning of D.C. Code § 28-3904. Members of the Damages class

were not aware of Defendants' price-fixing conspiracy and were

therefore unaware of the unfair and illegal overcharges. The

suppression of competition that has resulted from Defendants'

conspiracy has ultimately resulted in unconscionably higher prices for

consumers and a gross disparity between the price paid and the value

received for products containing Fragrance Products.

d) Defendants' unlawful conduct had the following effects: (1) Fragrance

Product price competition was restrained, suppressed, and eliminated

throughout the District of Columbia; (2) Fragrance Product prices

were raised, fixed, maintained, and stabilized at artificially high levels

throughout the District of Columbia; (3) Plaintiff Eleanor Pressler and

members of the Damages class were deprived of free and open

competition; and (4) Plaintiff Eleanor Pressler and members of the

Damages class paid supra-competitive, artificially inflated prices for

products containing Fragrance Products.

-149-

e)  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Eleanor Pressler and members of the Damages class were injured and are threatened with further injury. Accordingly, Plaintiff Eleanor Pressler and members of the Damages class seek all relief available under District of Columbia Code § 28-3901, et seq.

303.  **Florida**: Defendants have engaged in unfair, unconscionable, or deceptive acts or practices in violation of Fla. Stat. § 501.201(1).

a)  Defendants agreed to and did in fact, act in restraint of trade or commerce by affecting, fixing, raising, maintaining, controlling, and /or stabilizing the price of Fragrances and exercised their collective control to suppress innovation and consumer choice.

b)  Defendants concealed, suppressed, and omitted to disclose material facts to members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Fragrance Products. The concealed, suppressed, and omitted facts would have been important to Plaintiff Carmen Pelliteri and members of the Damages class as they related to the products containing Fragrance Products that they purchased.

c) Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Fragrance Products by making public statements that were not in accord with the facts.

d) Defendants' statement and conduct concerning the price of Fragrance Products were deceptive as they had the tendency or capacity to mislead Plaintiff Carmen Pelliteri and members of the Damages Class to believe that they were purchases products containing Fragrance Products with prices established by a free and fair market.

e) Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Florida; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff Carmen Pelliteri and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Carmen Pelliteri and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

f) During the Class Period, Defendants' illegal conduct had a substantial effect on Florida commerce and consumers.

g) As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiff Carmen Pelliteri and members of the Damages Class have been injured in their business and property and are threatened with further injury.

h) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Fla. Stat. § 501.201(1), et seq. Accordingly, Plaintiff Carmen Pelliteri and members of the Damages Class seek all relief available under Fla. Stat. § 501.201(1), et seq.

304.    **Hawaii**: Defendants have engaged in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Hawaii Rev. Stat. § 480-2. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which products containing Fragrance Products were sold, distributed, or obtained in Hawaii.

a) Plaintiffs Alana Manuia and Elli Ward and Members of the Damages Class purchased products containing Fragrance Products in Hawaii and/or purchased products containing Fragrance Products while residing in Hawaii at the time of their purchases.

-152-

b)  Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs Alana Manuia and Elli Ward and  members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Alana Manuia and Elli Ward and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

c)  During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

d)  As a direct and proximate result of Defendants' unlawful conduct, and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiffs Alana Manuia and Elli Ward and members of the Damages Class seek all relief available under the statute.

305.  **Illinois**: Defendants have engaged in unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/10a, et seq.

a) Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrance Products and exercised their collective control to suppress innovation and consumer choice.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Illinois commerce.

c) As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Suzen Isai, Joseph Collins and Samuel Johnson and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of 815 Ill. Comp. Stat. Ann. 505/10a, et seq. Accordingly, Plaintiffs Suzen Isai, Joseph Collins and Samuel Johnson and members of the Damages Class seek all relief available under 815 Ill. Comp. Stat. Ann. 505/10a, et seq.

306.   **Massachusetts**: Defendants have engaged in unfair or deceptive acts or practices in violation of 81 Massachusetts G.L. c. 93A, §2, et seq.

a) Defendants were engaged in trade or commerce as defined in G.L. c. 93A.

b) Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting,

fixing, raising, maintaining, controlling and/or stabilizing the price of Fragrance Products at artificial and non-competitive levels, the prices at which Fragrance Products were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from members of the Damages Class.

c) Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs Cynthia Reese and Douglas Borowski and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Cynthia Reese and Douglas Borowski and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

d) During the Class Period, Defendants' illegal conduct had a substantial effect on Massachusetts commerce and consumers.

e) As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Cynthia Reese and Douglas Borowski and members of the Damages Class have been injured in their business and property and are threatened with further injury.

-155-

f) Certain of Defendants have or will be served with a demand letter in accordance with G.L. c. 93A, §9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

g) Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs Cynthia Reese and Douglas Borowski and members of the Damages Class to multiple damages.

307. **Minnesota**: Defendants have engaged in unfair, unconscionable, or deceptive acts or practices in violation of Minn. Stat. § 325F.68, et seq.

a) Defendants engaged in the conduct described in this Complaint in connection with the sale of Fragrance Products in trade or commerce in a market that includes Minnesota.

b) Defendants agreed to, and did in fact, affect, fix, raise, maintain, control, maintain and/or stabilize the price of Fragrance Products at artificial and non-competitive levels, and exercised their collective control to suppress innovation and consumer choice. Such conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive, and

-156-

unscrupulous, and caused substantial injury to Plaintiff Andrea Hogan and members of the Damages Class.

c) Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Fragrance Products by making public statements that were not in accord with the facts.

d) Defendants' statements and conduct concerning the price of Fragrance Products were deceptive as they had the tendency or capacity to mislead Plaintiff Andrea Hogan and members of the Damages Class to believe that they were purchasing products containing Fragrances at prices established by a free and fair market.

e) Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff Andrea Hogan and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Andrea Hogan and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

f) During the Class Period, Defendants' illegal conduct had a substantial effect on Minnesota commerce.

g) As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiff Andrea Hogan and members of the Damages Class suffered ascertainable loss of money or property.

h) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Minn. Stat. § 325F.68, et seq. Accordingly, Plaintiff Andrea Hogan and members of the Damages Class seek all relief available under Minn. Stat. § 325F.68, et seq.

308. **Missouri**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020, et seq.

1. Plaintiff Tonia West and members of the Damages Class purchased products containing Fragrances Products in Missouri for personal, family, or household purposes, or resided in Missouri when they purchased products containing Fragrance Products in Missouri for personal, family or household purposes.

2. Defendants concealed, suppressed, and omitted to disclose material facts to members of the Damages Class concerning Defendants'

-158-

unlawful activities and artificially inflated prices for Fragrances. The concealed, suppressed, and omitted facts would have been important to Plaintiff Tonia West members of the Damages class as they related to the products containing Fragrance Products that they purchased.

3. Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff Tonia West and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Tonia West and members of the Damage Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

4. During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce and consumers.

5. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Tonia West and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiff Tonia West and members of the Damages Class seek all relief available under the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020, et seq.

309.  **Montana**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, et seq.

   a)  Plaintiff Mary Peterson and members of the Damages Class purchased products containing Fragrance Products in Montana for personal, family, or household purposes, or resided in Montana when they purchased products containing Fragrance Products in Montana for personal, family, or household purposes.

   b)  Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Montana; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff Mary Peterson and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Mary Peterson and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

   c)  During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

d) As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Mary Peterson and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiff Mary Peterson and members of the Damages Class seek all relief available under the Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, et seq.

310. **Nebraska**: Defendants have engaged in unfair methods competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, et seq.

a) Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff Jasmine Judy and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Jasmine Judy and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

b) During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Jasmine Judy and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiff Jasmine Judy and members of the Damages Class seek all relief available under the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, et seq.

311. **Nevada:** Defendants have engaged in deceptive trade practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, et seq.

a) Defendants engaged in the conduct described herein in connection with the sale of Fragrance Products in trade or commerce in a market that includes Nevada.

b) Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Fragrance Products were sold, distributed or obtained in Nevada, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial

injury to Plaintiffs Terry Brown, Kionna Love and Paula DiCianno and members of the Damages Class.

c)  Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs Terry Brown, Kionna Love and Paula DiCianno and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Fragrance Products. The concealed, suppressed, and omitted facts would have been important to members of the Damages Class as they related to the cost of products containing Fragrance Products that they purchased.

d)  Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Fragrance Products by making public statements that were not in accord with the facts.

e)  Defendants' statements and conduct concerning the price of Fragrance Products were deceptive as they had the tendency or capacity to mislead Plaintiffs Terry Brown, Kionna Love and Paula DiCianno and members of the Damages Class to believe that they were purchasing products containing Fragrance Products at prices established by a free and fair market.

f)  Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated

throughout Nevada; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs Terry Brown, Kionna Love and Paula DiCianno and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Terry Brown, Kionna Love and Paula DiCianno and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products. As a direct and proximate result of the above-described unlawful practices, members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs Terry Brown, Kionna Love and Paula DiCianno and members of the Damages Class seek all relief available under Nev. Rev. Stat. § 598.0993.

312.   **New Jersey**: Defendants have engaged in unfair or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56.8-2, et seq.

1.   Plaintiffs Arlinda Kongoli, Liridon Camaj, Monica Lord, and Christine Schorr and members of the Damages Class purchased products containing Fragrance Products in New Jersey for personal, family, or household purposes, or resided in New Jersey when they

-164-

purchased products containing Fragrance Products in New Jersey for personal, family or household purposes.

2.  Defendants concealed, suppressed, and omitted to disclose material facts to members of the Damages Class concerning Defendants' unlawful activities and artificially raised prices for Fragrance Products. The concealed, suppressed, and omitted facts would have been important to Plaintiffs Arlinda Kongoli, Liridon Camaj, Monica Lord, and Christine Schorr and members of the Damages class as they related to the products containing Fragrance Products that they purchased.

3.  Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs Arlinda Kongoli, Liridon Camaj, Monica Lord, and Christine Schorr and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Arlinda Kongoli, Liridon Camaj, Monica Lord, and Christine Schorr paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

4.   During the Class Period, Defendants' illegal conduct substantially affected New Jersey Commerce and consumers.

5.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Arlinda Kongoli, Liridon Camaj, Monica Lord, and Christine Schorr and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiffs Arlinda Kongoli, Liridon Camaj, Monica Lord, and Christine Schorr and members of the Damages Class seek all available relief under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56.8-2, et seq.

313.   **New Mexico**: Defendants have engaged in unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-3, et seq.

a)   Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrance Products and exercised their collective control to suppress innovation and consumer choice.

b)   During the Class Period, Defendants' illegal conduct had a substantial effect on New Mexico commerce.

c)   As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Jodie Elmore and Milan Montano and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of N.M. Stat. Ann. § 57-12- 3, et seq. Accordingly, Plaintiffs Jodie Elmore and Milan Montano and members of the Damages Class seek all relief available under N.M. Stat. Ann. § 57-12-3, et seq.

314. **New York**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New York Gen. Bus. Law § 349, et seq.

a) Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Fragrance Products were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiff Daniel Nabavian and members of the Damages Class.

b) Defendants and their co-conspirators made public statements about the prices of Fragrance Products and products containing Fragrances that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Fragrance

-167-

Products and products containing Fragrance Products; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

c) Because of Defendants' unlawful trade practices in New York, Plaintiff Daniel Nabavian and members of the Damages Class who purchased products containing Fragrance Products were misled to believe that they were paying a fair price for products containing Fragrance Products or the price increases for Fragrance Products were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

d) Defendants knew that their unlawful trade practices with respect to pricing Fragrance Products would have an impact on New York consumers and not just Defendants' direct customers.

e) Defendants knew that their unlawful trade practices with respect to pricing Fragrance Products would have a broad impact, causing customers who purchased products containing Fragrance Products to be injured by paying more for products containing Fragrance Products than they would have paid in the absence of Defendants' unlawful trade acts and practices.

f)  The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

g)  Defendants' unlawful conduct had the following effects: (1) Fragrance Products competition was restrained, suppressed, and eliminated throughout New York; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff Daniel Nabavian and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Daniel Nabavian and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

h)  During the Class Period, Defendants marketed, sold, or distributed Fragrance Products in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

i)  Plaintiff Daniel Nabavian and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

315.   **North Carolina**: Defendants have engaged in unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq.

a)  Defendants agreed to, and did in fact, act in restraint of trade or commerce by fixing, raising, maintaining, and/or stabilizing the price of Fragrance Products at artificial and non-competitive levels and took efforts to conceal their agreements from Plaintiffs Letia Dickerson, Kimberly Webb and Sophia Dashab and members of the Damages Class.

b)  Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs Letia Dickerson, Kimberly Webb and Sophia Dashab and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants' public statements concerning the price of Fragrance Products created the illusion of competitive pricing controlled by market forces rather

than supra-competitive pricing driven by Defendants' illegal conspiracy.

c) The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d) Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs Letia Dickerson, Kimberly Webb and Sophia Dashab and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs Letia Dickerson, Kimberly Webb and Sophia Dashab and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

e) During the Class Period, Defendants' illegal conduct had a substantial effect on North Carolina commerce and consumers.

f) As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiffs Letia Dickerson, Kimberly Webb and Sophia Dashab and members of the Damages Class have been injured in their business and property and are threatened with further injury.

g) By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of N.C. Gen. Stat. § 75-1.1, et seq. Accordingly, Plaintiffs Letia Dickerson, Kimberly Webb and Sophia Dashab and members of the Damages Class seek all relief available under N.C. Gen. Stat. § 75-1.1, et seq.

316. **Pennsylvania:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1, et seq.

a) Plaintiff Alex Greenzweig and members of the Damages Class purchased products containing Fragrances Products in Pennsylvania for personal, family, or household purposes, or resided in Pennsylvania when they purchased products containing Fragrance Products in Pennsylvania for personal, family, or household purposes.

b) Defendants concealed, suppressed, and omitted to disclose material facts to members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Fragrances. The

-172-

concealed, suppressed, and omitted facts would have been important to Plaintiff Alex Greenzweig and members of the Damages class as they related to the products containing Fragrance Products that they purchased.

c) Defendants' unlawful conduct had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout Pennsylvania; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Pennsylvania; (3) Plaintiff Alex Greenzweig and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Alex Greenzweig and members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

d) During the Class Period, Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

e) As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Alex Greenzweig and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiff Alex Greenzweig and members of the Damages Class seek all relief

available under the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1, et seq.

317. **South Carolina**: Defendants have engaged in unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, et seq.

a) Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrance Products and exercised their collective control to suppress innovation and consumer choice.

b) Defendants' combinations or conspiracies had the following effects: (1) Fragrance Product price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Fragrance Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff Charlotte Williams and members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supra-competitive, artificially inflated prices for products containing Fragrance Products.

c) During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

d) As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiff Charlotte Williams and members of the Damages Class have

been injured in their business and property and are threatened with further injury.

e) By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of S.C. Code Ann. § 39-5-10, et seq. Accordingly, Plaintiff Charlotte Williams and members of the Damages Class seek all relief available under S.C. Code Ann. § 39-5-10, et seq.

318. **Wisconsin**: Defendants have engaged in unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, et seq.

a) Defendants worked together to fix, raise, maintain, and stabilize the price of Fragrance Products and exercised their collective control to suppress innovation and consumer choice.

b) During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c) As a direct and proximate cause of the Defendants' unlawful conduct, Plaintiff Sandra Kluessendorf and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d) By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of Wisc. Stat. § 100.18, et seq.

-175-

Accordingly, Plaintiff Sandra Kluessendorf and members of the

Damages Class seek all relief available Wisc. Stat. § 100.18, et seq.

## COUNT 4: UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Damages Class)

319.   Plaintiff incorporates by reference the allegations in the preceding

paragraphs.

320.   To the extent required, this claim is pleaded in the alternative to the

other claims in this Complaint.

321.   As a result of their unlawful conduct described above, Defendants

have and will continue to be unjustly enriched. Defendants have been unjustly

enriched by the receipt of, at a minimum, unlawfully inflated prices and profits on

sales of Fragrance Products.

322.   Defendants have benefitted from their unlawful acts, and it would be

inequitable for Defendants to be permitted to retain any of the ill-gotten gains

resulting from the overpayments made by Plaintiff or the Class Members for

products containing Fragrance Products.

323.   Plaintiff and the members of the Damages Class are entitled to

Defendants' ill- gotten gains resulting from their unlawful, unjust, and inequitable

conduct. Plaintiff and the members of the Damages Class are entitled to the

establishment of a constructive trust consisting of all ill-gotten gains from which

Plaintiff and the members of the Damages Class may make claims on a pro rata basis.

324.   Pursuit of any remedies against the firms from whom Plaintiff and the members of the Damages Class purchased products containing Fragrance Products subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes of all others similarly situated, respectfully request that the Court grant judgment against Defendants as follows:

325.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

326.   That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

a) An unlawful combination, trust, agreement, understanding, and/or concert of action and an unreasonable restraint of trade or commerce in violation of the federal antitrust laws and state antitrust, unfair competition and consumer protection laws as set forth herein; and

b) Acts of unjust enrichment by Defendants as set forth herein.

327.   Plaintiffs and members of the Damages Class recover damages to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

328.   Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

329.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar

purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

330.   Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment.

331.   Plaintiffs and members of the Damages Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

332.   Plaintiffs and Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

333.   Plaintiffs and Class Members have such other and further relief as the case may require and the Court may deem just and proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

Dated:  February 5, 2024                  Respectfully submitted,

                                          *By: /s/ Michael D. Fitzgerald*
                                          Michael D. Fitzgerald
                                          **LAW OFFICES OF MICHAEL D. FITZGERALD**
                                          1 Industrial Way West, Unit B
                                          Eatontown, NJ 07724
                                          P.O. Box 1067
                                          Oakhurst, NJ 07755

Kellie Lerner (NJ Bar No. 018532003)
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas, Suite 2601
New York, New York 10019
Telephone: (212) 980-7400
klerner@robinskaplan.com

Kimberly A. Justice (*pro hac vice*)
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6487
kjustice@fklmlaw.com

*Interim Co-Lead Counsel for End-User Plaintiffs*

Robert Wozniak
Nia-Imara Binns
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4510
rwozniak@fklmlaw.com
nbinns@fklmlaw.com

William Caldes
**SPECTOR ROSEMAN & KODROFF, PC**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
bcaldes@srkattorneys.com

Telephone: (202) 349-1482
mdfitz@briellelaw.com

*Liaison Counsel for End-User Plaintiffs*

Benjamin D. Steinberg (*pro hac vice*)
Ellen G. Jalkut (*pro hac vice*)
Jordan B. Finkel (*pro hac vice*)
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas, Suite 2601
New York, New York 10019
Telephone: (212) 980-7400
bsteinberg@robinskaplan.com
ejalkut@robinskaplan.com
jfinkel@robinskaplan.com

Shpetim Ademi
**ADEMI LLP**
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Telephone: (414) 482-8000
sademi@ademilaw.com

Garrett D. Blanchfield
Roberta A. Yard
**REINHARDT WENDORF &
BLANCHFIELD**
332 Minnesota Street, Suite W1050
St. Paul MN 55101
Telephone: (651) 287-2100
g.blanchfield@rwblawfirm.com
r.ard@rwblawfirm.com

Dana R. Vogel
Christopher M. Sloot
**McCune Law Group**
2415 E. Camelback Rd., Suite 850
Phoenix, AZ 85016
Telephone: (909) 557-1250
drv@mccunewright.com
cms@mccunewright.com

*Counsel for End-User Plaintiffs*

Justin S. Nematzadeh
**NEMATZADEH PLLC**
101 Avenue of the Americas, Suite
909
New York, NY 10012
Telephone: 646 799-6729
jsn@nematlawyers.com

*Counsel for End-User Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 5, 2024, I electronically filed **END-USER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** with the Clerk of the Court for the United States District Court of New Jersey using the CM/ECF system and served a copy of same upon all counsel of record via the Court's electronic filing system.

*/s/ Michael D. Fitzgerald*
Michael D. Fitzgerald